# INTERNATIONAL SALT CO., INC. *v.* UNITED STATES.

No. 46.   Argued October 16, 1947.—Decided November 10, 1947.

*Lemuel Skidmore* argued the cause and filed a brief for appellant.

*Robert L. Stern* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, John C. Stedman* and *George L. Derr.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

The Government brought this civil action to enjoin the International Salt Company, appellant here, from carrying out provisions of the leases of its patented machines to the effect that lessees would use therein only International's salt products. The restriction is alleged to violate § 1 of the Sherman Act,[1] and § 3 of the Clayton Act.[2] Upon appellant's answer and admissions of fact, the Government moved for summary judgment under Rule 56 of the Rules of Civil Procedure, upon the ground that no issue as to a material fact was presented and

---

[1] 26 Stat. 209, § 1, 15 U. S. C. § 1.
[2] 38 Stat. 730, § 3, 15 U. S. C. § 14.

that, on the admissions, judgment followed as matter of law. Neither party submitted affidavits. Judgment was granted[3] and appeal was taken directly to this Court.[4]

It was established by pleadings or admissions that the International Salt Company is engaged in interstate commerce in salt, of which it is the country's largest producer for industrial uses. It also owns patents on two machines for utilization of salt products. One, the "Lixator," dissolves rock salt into a brine used in various industrial processes. The other, the "Saltomat," injects salt, in tablet form, into canned products during the canning process. The principal distribution of each of these machines is under leases which, among other things, require the lessees to purchase from appellant all unpatented salt and salt tablets consumed in the leased machines.

Appellant had outstanding 790 leases of an equal number of "Lixators," all of which leases were on appellant's standard form containing the tying clause[5] and other

---

[3] 6 F. R. D. 302.

[4] Probable jurisdiction noted April 28, 1947.

[5] "It is further mutually agreed that the said Lixate Process Dissolver shall be installed by and at the expense of said Lessee and shall be maintained and kept in repair during the term of this lease by and at the expense of said Lessee; that the said Lixate Process Dissolver shall be used for dissolving and converting into brine only those grades of rock salt purchased by the Lessee from the Lessor at prices and upon terms and conditions hereafter agreed upon, PROVIDED:

"If at any time during the term of this lease a general reduction in price of grades of salt suitable for use in the said Lixate Process Dissolver shall be made, said Lessee shall give said Lessor an opportunity to provide a competitive grade of salt at any such competitive price quoted, and in case said Lessor shall fail or be unable to do so, said Lessee, upon continued payment of the rental herein agreed upon, shall have the privilege of continued use of the said equipment with salt purchased in the open market, until such time as said

standard provisions; of 50 other leases which somewhat varied the terms, all but 4 contained the tying clause. It also had in effect 73 leases of 96 "Saltomats," all containing the restrictive clause.[6]  In 1944, appellant sold approximately 119,000 tons of salt, for about $500,000, for use in these machines.

The appellant's patents confer a limited monopoly of the invention they reward.  From them appellant derives a right to restrain others from making, vending or using the patented machines.  But the patents confer no right

Lessor shall furnish a suitable grade of salt at the said competitive price."

It further provides as follows:

". . . should said Lessee fail to pay promptly the aforesaid rental, or shall at any time discontinue purchasing its requirements of salt from said Lessor, or otherwise breach any of the terms and conditions of this lease, said Lessor shall have the right, upon 30 days' written notice of intention to do so, to remove the said Lixate Process Dissolver from the possession of said Lessee."

[6] "It is further mutually agreed that the said Salt Tablet Depositor(s) shall be installed and maintained in good condition during the term of this lease: that the said Salt Tablet Depositor(s) shall be used only in conjunction with Salt Tablets sold or manufactured by the Lessor, and that the Lessee shall purchase from the Lessor, or its agent, Salt Tablets for use in the Salt Tablet Depositor(s) at prices and upon terms and conditions hereinafter agreed upon, Provided: If, at any time during the term of this lease, a general reduction in Lessor's price of Salt Tablets suitable for use in the Depositor(s) shall be made, said Lessor shall provide said Lessee with Salt Tablets at a like price."

The lease further provides:

". . . should Lessee fail to pay promptly the aforesaid rental, or at any time discontinue purchasing its requirements of Salt Tablets for said Salt Tablet Depositor(s) from said Lessor, or its agent, or otherwise breach any of the terms and conditions of this lease, said Lessor shall have the right, upon ten days' written notice of intention to do so, to remove the said Salt Tablet Depositor(s) from the premises and/or possession of said Lessee."

to restrain use of, or trade in, unpatented salt. By contracting to close this market for salt against competition, International has engaged in a restraint of trade for which its patents afford no immunity from the antitrust laws. *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488; *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661; *Mercoid Corp.* v. *Minneapolis-Honeywell Co.*, 320 U. S. 680.

Appellant contends, however, that summary judgment was unauthorized because it precluded trial of alleged issues of fact as to whether the restraint was unreasonable within the Sherman Act or substantially lessened competition or tended to create a monopoly in salt within the Clayton Act. We think the admitted facts left no genuine issue. Not only is price-fixing unreasonable, *per se,* *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150; *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, but also it is unreasonable, *per se,* to foreclose competitors from any substantial market. *Fashion Originators Guild* v. *Federal Trade Commission,* 114 F. 2d 80, affirmed, 312 U. S. 457. The volume of business affected by these contracts cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious. Under the law, agreements are forbidden which "tend to create a monopoly," and it is immaterial that the tendency is a creeping one rather than one that proceeds at full gallop; nor does the law await arrival at the goal before condemning the direction of the movement.

Appellant contends, however, that the "Lixator" contracts are saved from unreasonableness and from the tendency to monopoly because they provided that if any competitor offered salt of equal grade at a lower price, the lessee should be free to buy in the open market, unless appellant would furnish the salt at an equal price; and

the "Saltomat" agreements provided that the lessee was entitled to the benefit of any general price reduction in lessor's salt tablets. The "Lixator" provision does, of course, afford a measure of protection to the lessee, but it does not avoid the stifling effect of the agreement on competition. The appellant had at all times a priority on the business at equal prices. A competitor would have to undercut appellant's price to have any hope of capturing the market, while appellant could hold that market by merely meeting competition. We do not think this concession relieves the contract of being a restraint of trade, albeit a less harsh one than would result in the absence of such a provision. The "Saltomat" provision obviously has no effect of legal significance since it gives the lessee nothing more than a right to buy appellant's salt tablets at appellant's going price. All purchases must in any event be of appellant's product.

Appellant also urges that since under the leases it remained under an obligation to repair and maintain the machines, it was reasonable to confine their use to its own salt because its high quality assured satisfactory functioning and low maintenance cost. The appellant's rock salt is alleged to have an average sodium chloride content of 98.2%. Rock salt of other producers, it is said, "does not run consistent in sodium chloride content and in many instances runs as low as 95% of sodium chloride." This greater percentage of insoluble impurities allegedly disturbs the functioning of the "Lixator" machine. A somewhat similar claim is pleaded as to the "Saltomat."

Of course, a lessor may impose on a lessee reasonable restrictions designed in good faith to minimize maintenance burdens and to assure satisfactory operation. We may assume, as matter of argument, that if the "Lixator" functions best on rock salt of average sodium chloride content of 98.2%, the lessee might be required to use

only salt meeting such a specification of quality. But it is not pleaded, nor is it argued, that the machine is allergic to salt of equal quality produced by anyone except International. If others cannot produce salt equal to reasonable specifications for machine use, it is one thing; but it is admitted that, at times, at least, competitors do offer such a product. They are, however, shut out of the market by a provision that limits it, not in terms of quality, but in terms of a particular vendor. Rules for use of leased machinery must not be disguised restraints of free competition, though they may set reasonable standards which all suppliers must meet. *Cf. International Business Machines Corp.* v. *United States,* 298 U. S. 131.

Appellant urges other objections to the summary judgment. The tying clause has not been insisted upon in all leases, nor has it always been enforced when it was included. But these facts do not justify the general use of the restriction which has been admitted here.

The appellant also strongly objects to the provisions of the sixth paragraph of the decree.[7] Appellant denies

---

[7] "Defendant International Salt is directed to offer to lease or sell or license the use of the Lixator or Saltomat machines, or any other machine which is then being or about to be offered or shall have been offered by such defendant in the United States embodying inventions covered by any of the patents referred to in paragraph II hereof, to any applicant on non-discriminatory terms and conditions; *provided* that

"(a) A machine or machines is or are available for such purposes and

"(b) Defendant shall not be required to make such offer unless it is offering, about to offer, or has offered such machines for lease or sale or license within the United States and at any time the defendant may discontinue the business of renting or selling or licensing the use of such machines; and

"(c) Such sale or lease or license is not required to be made without cash payment or security to any person not having proper credit rating, and

"(d) The rental or sale price or license royalty may differ as to dif-

the necessity for such provision and it is true that the record discloses no threat to discriminate after the judgment of the court is pronounced. It also suggests that we modify the judgment to accept a proposed alternative provision [8] similar to one it says it urged upon the District Court, which rejected it. The record does not show what proceedings were had between rendering of the court's opinion and signing of the decree.

The specific ground of objection raised by appellant to paragraph sixth is that International may find it necessary in some sections of the country to reduce the rental rates of the machines in order that its machines may compete with those of others. Of course, the Clayton Act itself [9] permits one charged with price discrimination to show that he lowered his price in good faith to meet competition. Obviously, the District Court was not intending to prevent competition or to disable the appellant from meeting or offering it. The Government, too, says it would not oppose permitting a lower price to meet, in good faith, the equally low price of a competitor if the need arose.

---

ferent types and sizes of machines and from time to time so long as the rental or sale price or royalty at any one time is uniform as to each size or type of machine. The terms of this paragraph shall apply to all future contracts and modifications of existing contracts. Any person with whom defendant International Salt now has a lease agreement relating to the Lixator or Saltomat machines may elect to retain his rights under the existing lease or to enter into a lease or sale or license contract with defendant International Salt in accordance with the provisions of this paragraph."

[8] Defendant would be enjoined "from refusing to sell, lease or license the use of any such machine to any person, firm or corporation, or from discriminating in the terms of any contract of sale, lease or license of any such machine with any person, firm or corporation, against the prospective buyer, lessee or licensee on the ground that he has used or dealt in, or intends or proposes to use or deal in, salt not manufactured or sold by the defendant International Salt."

[9] 38 Stat. 730, 49 Stat. 1526, 15 U. S. C. § 13b.

The short of the contention is that since the company never has threatened to violate any decree entered in this case to restrain future use of the illegal leases, it feels that the provision invalidating the objectionable leases should end the matter and that, as to any additional provisions, appellant is entitled to stand before the court in the same position as one who has never violated the law at all—that the injunction should go no farther than the violation or threat of violation. We cannot agree that the consequences of proved violations are so limited. The fact is established that the appellant already has wedged itself into this salt market by methods forbidden by law. The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. And advantages already in hand may be held by methods more subtle and informed, and more difficult to prove, than those which, in the first place, win a market. When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed. The usual ways to the prohibited goal may be blocked against the proven transgressor and the burden put upon him to bring any proper claims for relief to the court's attention. And it is desirable, in the interests of the court and of both litigants, that the decree be as specific as possible, not only in the core of its relief, but in its outward limits, so that parties may know their duties and unintended contempts may not occur.

The framing of decrees should take place in the District rather than in Appellate Courts.[10] They are invested

---

[10] That court is authorized, but not required, to call upon the Federal Trade Commission to assist in framing decrees in antitrust cases. § 7, Federal Trade Commission Act, 38 Stat. 722. This would

with large discretion to model their judgments to fit the exigencies of the particular case. *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185; *United States* v. *National Lead Co.,* 332 U. S. 319. In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints. If this decree accomplishes less than that, the Government has won a lawsuit and lost a cause.

The District Court has retained jurisdiction, by the terms of its judgment, for the purpose of "enabling any of the parties . . . to apply to the court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment" and "for the amendment, modifications or termination of any of the provisions . . . ." We think it would not be good judicial administration to strike paragraph VI from the judgment to meet a hypothetical situation when the District Court has purposely left the way open to remedy any such situations if and when the need arises. The factual basis of the claim for modification should appear in evidentiary form before the District Court rather than in the argumentative form in which it is before us. Nor are we impressed that this will require a multitude of separate applications. Once the concrete problem is before the District Court it will no doubt be able to fashion a provision that will avoid repetitious applications which would be as vexatious to the Court as to the litigants. We leave the appellant to proper appli-

seem unnecessary if Congress intended a simple prohibition of the particular practice proved before the court. It indicates the Congress has intended decrees to deal with the future economic condition of the enterprise as well as past violations.

cation to the court below and deny the relief here, upon the present state of the record, without prejudice.

*Judgment affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE REED and MR. JUSTICE BURTON join, dissenting in part.

Agreeing wholeheartedly with the Court's opinion on the main issue, I am left unpersuaded by its justification for retaining Paragraph VI [1] in the judgment.

---

[1]                                  "VI

"Defendant International Salt is directed to offer to lease or sell or license the use of the Lixator or Saltomat Machines, or any other machine which is then being or about to be offered or shall have been offered by such defendant in the United States embodying inventions covered by any of the patents referred to in paragraph II hereof, to any applicant on non-discriminatory terms and conditions; *provided* that

"(a) A machine or machines is or are available for such purposes and

"(b) Defendant shall not be required to make such offer unless it is offering, about to offer, or has offered such machines for lease or sale or license within the United States and at any time the defendant may discontinue the business of renting or selling or licensing the use of such machines; and

"(c) Such sale or lease or license is not required to be made without cash payment or security to any person not having proper credit rating, and

"(d) The rental or sale price or license royalty may differ as to different types and sizes of machines and from time to time so long as the rental or sale price or royalty at any one time is uniform as to each size or type of machine. The terms of this paragraph shall apply to all future contracts and modifications of existing contracts. Any person with whom defendant International Salt now has a lease agreement relating to the Lixator or Saltomat machines may elect to retain his rights under the existing lease or to enter into a lease or sale or license contract with defendant International Salt in accordance with the provisions of this paragraph."

Inasmuch as the holder of patents on machines is not obliged to dispose of them to all comers or to do so at a uniform price, Paragraph VI in and of itself undoubtedly deprives appellant of a legal right. It is not merely a theoretical right. Practical considerations may make it important for appellant to act upon its legal right not to have a uniform price for all its customers. It was conceded at the bar that competition may require this. No doubt, when a court condemns practices as violative of the Sherman Law and the Clayton Act, it has the duty so to fashion its decree as to put an effective stop to that which is condemned. But the law also respects the wisdom of not burning even part of a house in order to roast a pig. Ordinarily, therefore, when acts are found to have been done in violation of antitrust legislation, restraint of such acts in the future is the adequate relief. See *New York, New Haven & Hartford R. Co.* v. *Interstate Commerce Commission,* 200 U. S. 361, 404; *Standard Oil Co.* v. *United States,* 221 U. S. 1, 77; *Labor Board* v. *Express Publishing Company,* 312 U. S. 426, 435–37. Reflecting the dictates of fairness, equity does not put under ban that which is intrinsically legitimate unless for all practical purposes it is tied with the illegitimate, or the circumstances of the case make it reasonable to assume that pursuit of what is legitimate would be a cover for doing what is forbidden.

The Government argues, in effect, that to compel appellant to observe uniformity of price for its machines removes any temptation for more favorable treatment of a customer who buys its salt. But that is precisely the aim of the main decree—it prohibits extension of the patent for the machines by requiring as a condition of its acquisition the purchase of non-patented salt. The presupposition of Paragraph VI is that the appellant will disobey that which the court explicitly forbids, so that the with-

drawal of an otherwise legal right to fix the purchase price of patented machines is employed as a precautionary screw to hold the appellant down from disobeying the court's decree. Surely a court of equity ought not to add to its prohibition of the illicit a prohibition of the licit unless the two are practically intertwined or there is some ground for believing that the licit will surreptitiously be misused in order to accomplish the illicit. There should be no such prohibition merely as a re-enforcement of the appropriate presupposition that a litigant, not shown to have been recalcitrant or underhanded, will obey the court's decree. If he does, the power of contempt is there to enforce obedience. It is suggested that if the presupposition of obedience is to be entertained it is unnecessary to enjoin even illegal conduct. But, surely, it is one thing to decree prohibition of conduct found to be illegal and a wholly different thing to add thereto the prohibition of that which is otherwise legal on the theory that thereby any temptation to persist in the forbidden illegality is removed.

Upon the record before us there is nothing to suggest that the appellant is likely to disobey the decree not only of the District Court against a continuance of illegal leases, but what in effect, upon affirmance, becomes a decree of this Court. It must be remembered that the Government saw fit to move for judgment on the pleadings. It thereby raised a pure legal question as to the validity of the leases on their face. The Government chose not to try to lay bare, as is often done in Sherman Law cases, fair and unfair practices inextricably blended. In such a situation the lawful has to fall with the unlawful. Having invited judgment on the bare bones of the pleadings which merely raise the validity of the tying clauses, the Government is not entitled to remedies which go beyond the justification of the pleadings. The Gov-

ernment ought not to have it both ways. The Government is not entitled to a provision in the decree which can be justified only on some indication in the record, of which here there is none, that appellant's past shows a devious temper which needs to be hobbled by withdrawing a conceded legal right.

In comparable situations, where orders of the Federal Trade Commission come here for review, this Court has sought to protect otherwise legitimate rights even where a business has indulged in unfair methods of competition. The Commission is not authorized to make its order needlessly destructive. The baby is not to be thrown out with the bath. See *Federal Trade Commission* v. *Royal Milling Co.*, 288 U. S. 212, and *Jacob Siegel Co.* v. *Federal Trade Commission*, 327 U. S. 608. Accordingly, if this were a review of an order of the Federal Trade Commission, I should remit the order for appropriate reconsideration by the Commission. Since this is a review of a lower federal court and the record presumably presents to us all that was before the District Court in support of Paragraph VI, we could dispose of the matter here.

But the molding of decrees in Sherman Law cases is normally the business of district courts. They have a scope of discretion which should not unduly be cut off by a recasting of the decree on appeal here. (It is worth noting that the availability of the Federal Trade Commission in the role of a master in chancery to help mold decrees in suits under the antitrust statutes apparently does not apply to a suit like the present, where judgment was asked on the pleadings and no testimony was taken. See § 7 of the Federal Trade Commission Act, 38 Stat. 717, 722, 15 U. S. C. § 47.) And so I would remand the case to the District Court. It has been suggested that Paragraph VI is merely a roundabout way of saying that the appellant should not discriminate in the price of its

patented machines in favor of a purchaser of its salt. If such was the intention of Paragraph VI, the District Court will want to convey such meaning less ambiguously.[2]

As the paragraph stands, I do not see how any lawyer would advise that the appellant could vary its prices among customers in different localities for a legitimate reason without each time going to the District Court for a modification of the decree. That is not a burden which, on this record, ought to be placed on the appellant. The undue sting of Paragraph VI is not saved by the fact that it is "specific." Of course it is in the interest of courts and of litigants that the terms of a decree be as specific as possible. But the desideratum of explicitness does not dispense with the requirement that remedies be appropriate to the condemned illegality. It does not draw the sting of undue prohibition of lawful conduct to make the prohibition specific.

---

[2] See the clause which the appellant proposed to the District Court, enjoining it "from refusing to sell, lease or license the use of any such machine to any person, firm or corporation, or from discriminating in the terms of any contract of sale, lease or license of any such machine with any person, firm or corporation, against the prospective buyer, lessee or licensee on the ground that he has used or dealt in, or intends or proposes to use or deal in, salt not manufactured or sold by the defendant International Salt."