CURLY'S DAIRY, INC., a corporation,
and Timber Valley Dairy, Inc., a
corporation, Plaintiffs,

v.

DAIRY COOPERATIVE ASSOCIATION,
a cooperative association, Defendant.

Civ. No. 60–319.

United States District Court
D. Oregon.

Jan. 19, 1962.

■■■■■■■■■■■■■■■

———◆———

Robert R. Hollis, Portland, Or., for plaintiff.

Lofton L. Tatum of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendant.

KILKENNY, District Judge.

Plaintiffs seek an injunction and a money judgment on a theory that defendant has violated §§ 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2) and § 3 of the Clayton Act (15 U.S.C.A. § 14).

Plaintiff Curly's Dairy, Inc. (Curly) is an Oregon corporation with its principal office and place of business in the City of Salem, Marion County, Oregon. Plaintiff Timber Valley Dairy, Inc. (Timber Valley) is an Oregon corporation with its principal office in said City of Salem and its principal place of business in Lebanon, Linn County, Oregon. Said corporations are operated under a common management.

Defendant is a cooperative association organized under the laws of the state of Oregon, with its principal office and place of business in the City of Portland, Multnomah County, Oregon. It uses the trade name Mayflower.

Curly is engaged in the business of purchasing, transporting, processing, distributing and selling, wholesale and retail, of certain foodstuffs commonly known as "dairy products" in and around the City of Salem and other cities in that immediate vicinity. Timber Valley is engaged in the same business in and around the city of Lebanon and other cities in the same immediate vicinity, the operations of Curly and Timber Valley being restricted to those particular areas in the Willamette Valley, Oregon.

Defendant owns and operates dairy products processing plants and facilities at various points in the states of Oregon and Washington and engages in said business, in interstate commerce, at various points in such states and, in particular,

in the trading area of, and in direct competition with, plaintiffs and other persons, firms and corporations engaged in the same business.

Plaintiffs contend that for several years the defendant had conducted an organized program for the lending of money in and around the cities and localities comprising the plaintiffs' trade areas in and connection with such organized program for the lending of money, and as an integral part thereof, the defendant engaged in and continues to engage in practices which would require borrowers to purchase 100% of their dairy requirements from defendant so long as the indebtedness remained unpaid, and that as part of such program the defendant:

(1) systematically limited the class of those eligible for loans to persons or organizations engaged in the retail marketing of dairy products;

(2) systematically attempted to induce prospective borrowers in such class to discontinue purchasing dairy products from the plaintiffs and, in return for the making of such loans, to purchase dairy products exclusively from the defendant;

(3) systematically employed as security for such loans real and personal property mortgages and conditional sales contracts;

(4) systematically employed, in connection with such real and chattel mortgages, provisions which would require borrowers to deal only with defendant on dairy products; and

(5) systematically sold chattels to borrowers on conditional sales contracts and in connection with such sales, and as a condition thereof, defendant obtained or attempted to obtain from the effected borrowers a collateral agreement to discontinue purchasing dairy products from plaintiffs and to refrain from purchasing dairy products from plaintiffs in the future.

The proof discloses that eight mortgages contained a clause which would require the borrower to purchase 100% of its dairy requirements from defendant as long as the debt remained unpaid. One

chattel mortgage required the purchase of 80% of the borrower's dairy requirements. In approximately fifteen transactions certain loan applications contained a notation "100% Mayflower." The weight of the evidence is that this notation indicated that the customer was already a 100% customer of defendant. In any event, neither the promissory note nor the conditional sales contract which formalized the transaction contained language which would indicate an exclusive arrangement.

Plaintiffs take the position that these agreements, considered separately, and taken together with the defendant's practices in relation to the lending of money, are unreasonable per se and unreasonable quantitatively in that they:

(a) directly and systematically foreclose competition in a not insignificant part of commerce and trade;

(b) constitute an attempt to systematically monopolize a not insignificant part of commerce and trade and were entered into in pursuance of an unlawful purpose;

(c) constitute an attempt to induce plaintiffs' customers to discontinue dealing with plaintiffs for reasons and considerations wholly unrelated to the comparative quality, attractiveness or competitive merit of defendant's products and are entered into in pursuance of an unlawful purpose;

(d) constitute an attempt to induce merchants to refrain from dealing with plaintiffs for reasons and considerations wholly unrelated to the comparative quality and competitive merit of defendant's products in relation to plaintiffs' products and were entered into in pursuance of an unlawful purpose; and

(e) constitute an aggressive and excessive use of an otherwise legitimate business practice, i. e. the lending of money, for the primary purpose of gaining an unlawful collateral advantage tending to create a monopoly in a not insignificant part of commerce and trade.

Historically, the Milk Control law of the state of Oregon severely restricted competition in the dairy products business in that state. During the effective period of such law, defendant competed with Curly in the Salem area and with Timber Valley in the Lebanon area. The Milk Control law and the regulations promulgated thereunder did not allow others to compete in those areas. With the passing of that law the parties to this action were met with the aggressive competition of such competitors as Carnation, Sunnybrook (which later withdrew) and Arden Farms. Independent sales by small farmers (juggers) added to the competitive field. Lebanon had a similar situation. Lucerne, Carnation, Arden and Snow Peak entered into the competitive field in that area, along with the juggers. It was only after the artificial restrictions of the Milk Control law were removed that financing of the retail outlets in the Lebanon-Salem area commenced.

The testimony is undisputed that concerns occupying the same relative position as defendant uniformly assist retail outlets by various means of financing and that such financing is welcomed by grocery stores and other outlets interested in the sale of dairy products. Plaintiffs concede that they have engaged in such financing measures from time to time. The evidence shows that plaintiffs have increased their share of the dairy business in the Salem-Lebanon competitive area during the period in question and that during the same period the business of the defendant has gradually declined. In most cases, the request for financing was initiated by the customer and not by defendant. Of a total of 329 grocery outlets in the Salem-Lebanon area, only 5 signed the 100% mortgage, approximately 1.5% of the total. Twenty-six of the restaurants in the same area obtained financing. Only 3 of these executed chattel mortgages containing 100% clauses. The remaining 23 transactions were in the form of conditional sales contracts, none of which contained the 100% clause. Eighteen of these were for ice cream equipment and eight for milk dispensers. In this area there were 353 restaurants;

therefore, the restrictive agreements would apply to less than 1% of the total. There is no evidence that a large volume of dairy products were sold through these restricted outlets.

■ It is clear that the relevant competitive market is not ordinarily susceptible to a "metes and bounds" definition. Times-Picayune Publishing Co. v. United States, (1953) 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277. It is, generally speaking, the area in which the defendant and its competitors effectively compete. Standard Oil Co. of California & Standard Stations v. United States, (1949) 337 U.S. 293, 69 S.Ct. 1051, 93 L. Ed. 1371. The relevant competitive market would be all that area directly effected by the competitive activity in such field in the line of commerce involved. Competitive action in any part of this area, under the evidence in this case, would have a substantial effect on competition throughout the rest of the area.

■ After a review of all of the evidence, I find that the relevant competitive market area, i. e. the area covered by effective competitors of the defendant, is southwestern Washington and all of Oregon, with the exception of the southeastern portion. That area is not restricted to the Lebanon-Salem sector as contended for by defendant.

It is conceded that certain agreements or practices are per se unreasonable restraints on competition and that proof of their existence is sufficient to show a violation of the Sherman and Clayton Acts without further inquiry into the economic effects of such agreements or practices. Among these are what are known as tying agreements. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. Before us in this case is a different type of contract known as an exclusive dealership or requirements contract.

First to be considered is the applicability of § 3 of the Clayton Act to the factual background of this case. Plaintiffs rely on Standard Oil Company of California & Standard Stations v. United States, (1949) 337 U.S. 293, 69 S.Ct. 1051, and other cases. Standard Oil deals with exclusive dealership contracts for oil products. The area of competition was described as "Arizona, California, Idaho, Nevada, Oregon, Utah and Washington." Standard was the largest seller of gasoline in the area and its sales constituted 6.7% of the total gallonage sold in the area. Stations with Standard exclusive supply contracts constituted 16% of the retail gasoline outlets in said area. Standard was not considered to have a dominant position in the industry, it being undisputed that Standard's major competitors employed similar exclusive dealing arrangements. The court distinguished between tying agreements and exclusive dealership contracts by recognizing that under certain circumstances the exclusive dealership contracts might be econominally justified and be beneficial to the public, while tying agreements could never have such a result. However, the court in Standard Oil concluded to apply the tying agreement rule as recognized in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, to the particular facts in the Standard case, stating that the qualifying clause of § 3 was satisfied by proof that competition had been foreclosed in a substantial share of the line of commerce affected. Without question each exclusive dealership or supply contract limits competition to some extent. For decision is the scope of the commerce affected and do the facts in this case show that the effect of the contracts is to foreclose competitors from a substantial share of the commerce in question?

The most recent case on the subject is Tampa Electric Co. v. Nashville Coal Co., (1961) 365 U.S. 320, 81 S.Ct. 623, 5 L. Ed.2d 580. Although Tampa is limited in scope, it is quite clear that the opinion narrows the application of the Standard decision to the particular facts in that case. The court in Tampa made it perfectly clear that neither comparative quantitative substantiality (i. e., the market share foreclosed) nor absolute quantitative substantiality (i. e., the dol-

lar volume foreclosed) (as defined in Standard) should be the controlling factor. It is there held that the trial court should take into account three factors in weighing the probable effect of the contract on the relevant area of effective competition: (1) the relative strength of the parties; (2) the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area; and (3) the probable immediate and future effects which *preemption* of that share of the market might have on effective competition therein. The court then goes on to say that the mere showing that the contract itself involves a substantial number of dollars is of little consequence.

The court distinguishes the decision in Tampa from others, (p. 334, 81 S.Ct. p. 631):

"* * * There is here neither a seller with a dominant position in the market as in Standard Fashions [Standard Fashions Co. v. Magrane-Houston Co.], supra [258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653]; nor myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts, as in Standard Oil, supra; nor a plainly restrictive tying agreement as in International Salt, supra. * * *"

Tampa makes it clear that the threatened foreclosure of competition must be in relation to the *market effected* and that the competition foreclosed by the contract must constitute a substantial share of the relevant market. Applying the test announced in Tampa to the facts in this case we find that (1) the defendant does not occupy a dominant position in the relevant market area, as I have found it under the facts in this case; nor (2) does the defendant have myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying on exclusive contracts, as was present in Standard Oil; nor (3) are we concerned with a plainly restrictive tying agreement, as existed in International Salt. On the other hand, we seem to be dealing

with a series of contracts which "may well be of economic advantage to buyers as well as to sellers." Standard Oil Co. of California & Standard Stations v. United States, supra, 337 U.S. p. 306, 69 S.Ct. p. 1058.

The doctrine taught by Tampa is that the Court must look at the facts in each particular case and weigh the good and the bad economic effects produced by the contract and in doing so must look beyond the language of the dealership contract dealing with its exclusive nature and then weigh the effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce in the relevant market area, and the probable immediate and future effects which the seizure of that share of the market might have on effective competition.

Applying this dogma to the facts in the present case, I find no difficulty in holding that the plaintiffs have failed to carry their burden and that the evidence and the law support the contentions of the defendant. When the Court views the small number of exclusive contracts in the light of the huge competitive area involved, rather than the comparatively insignificant Salem-Lebanon area, I find nothing which points to a violation of either the Clayton Act or the Sherman Act.

SHERMAN ACT

My decision that § 3 of the Clayton Act is not applicable to the facts as I find them in this case is dispositive of plaintiffs' claims under §§ 1 and 2 of the Sherman Act. Under the factual background of this case, if there is no violation of the Clayton Act, there can be no violation of §§ 1 and 2 of the Sherman Act. Times-Picayune Publishing Co. v. United States, supra, 345 U.S. pp. 608–609, 73 S.Ct. pp. 872–873; Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. p. 335, 81 S.Ct. p. 623. In addition, I specifically find that defendant's conduct is not in violation of such sections.

A number of other cases cited by plaintiffs and defendant have received the

**486**

careful consideration of the court. However, I feel that the decision in Tampa controls my decision on the facts in this case and that defendant has violated neither of said Acts.

Counsel for defendant may prepare appropriate findings and decree.