BIGOS v NATIONWIDE MOBILE HOME PARKS, INC

Docket No. 44575. Submitted April 7, 1980, at Detroit.—Decided April
7, 1981. Leave to appeal applied for.

Plaintiffs, Bernard Bigos, Richard Dixon and Hugo Myers, were
mobile home owners who rented lots from defendant Royal
Holiday Mobile Home Park. Defendant Nationwide Mobile
Home Parks, Inc., a Michigan corporation in the business of
selling mobile homes, is located on the premises of Royal
Holiday. Individuals who rented lots in Royal Holiday and who
sought to sell their mobile homes had to pay $1,000 to Nation-
wide or to Royal Holiday in order to leave their homes set up
on the site so that their buyers could lease the same space. If a
purchaser was not granted a lease by Royal Holiday, the seller
was obligated to remove his mobile home from the park upon
termination of his tenancy in the park. Due to the expenses
and inconvenience involved in moving a mobile home from one
site and setting it up on another, it was desirable to have a
home that was set up and ready for occupancy. Plaintiffs all
paid the $1,000 fee when they moved from Royal Holiday.
Plaintiffs brought an action in Wayne Circuit Court contesting
the validity of this practice and the Attorney General of the

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 59 Am Jur 2d, Parties § 51.
[2] 59 Am Jur 2d, Parties §§ 62, 95.
[3, 4] 59 Am Jur 2d, Parties § 53.
[5] 4 Am Jur 2d, Appeal and Error § 76.
    32 Am Jur 2d, Federal Practice and Procedure § 309.
    Application of "clearly erroneous" test of Rule 52(a) of Federal
    Rules of Civil Procedure to trial court's findings of fact based on
    documentary evidence. 11 ALR Fed 212.
[6-8] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair
    Trade Practices §§ 59 *et seq.*, 451 *et seq.*
    What constitutes "sufficient economic power" to make tying ar-
    rangements unlawful restraint of trade violative of Sherman Act
    (15 USCS § 1). 51 L Ed 2d 826.
[9] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices § 30.
[10] 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade
    Practices § 455.

State of Michigan intervened on the side of the plaintiffs. The case was heard by the trial court as a class action although no class notice was filed and no members of the class other than the named plaintiffs appeared personally. The trial court found that defendants had violated Michigan's Trusts, Monopolies and Combinations Act of 1899 and that, separate from a tying violation, the charging of a fee for the transfer of tenancy was unconscionable. Plaintiffs were granted a two-fold recovery of the $1,000 fee paid, pursuant to the terms of the act at the time that plaintiffs filed their complaint. The court also granted relief to the entire class of persons similarly situated and fined defendants $10,000, Audrey C. Stroia, J. Defendants appeal. *Held:*

1. The trial court's finding that the arrangement complained of in this case was an unlawful tie-in scheme under the Michigan anti-trust statute and that it was illegal per se and in violation of the Sherman Anti-Trust Act and the Clayton Act is clearly erroneous. Although tying has been held to be a restrictive practice, it is not specifically prohibited by either the Sherman Act or the Michigan Trusts, Monopolies and Combinations Act. The tying product in this case is the transfer of tenancy and, although defendants did possess the requisite economic market power in the tying product for the tying arrangement to be considered unreasonable per se, the basis of illegality under the Sherman Act and the Michigan act is restraint of trade or commerce. The common thread of illegality is identified with restraint of freedom of competition. The evidence does not support a finding that any actual or potentially identifiable competition was appreciably restrained, if at all.

2. Because this is a spurious class action, persons who did not affirmatively join the litigation are not bound by the decision. They were not represented in or touched by the suit, so their due process rights are not affected. The judgment in this case binds only the named plaintiffs.

Reversed.

1. ACTIONS — CLASS ACTIONS — SPURIOUS CLASS ACTIONS — COURT RULES.

A spurious class action is one in which there are no jointly held rights but simply common questions of law or fact (GCR 1963, 208.1[3]).

2. ACTIONS — CLASS ACTIONS — SPURIOUS CLASS ACTIONS.

A spurious class action is simply a form of permissive joinder of

parties and the judgment in such an action binds only those similarly situated individuals who affirmatively indicate to the court their desire to be included in the class.

3. ACTIONS — CLASS ACTIONS — SPURIOUS CLASS ACTIONS.

Persons who do not affirmatively join the litigation in a spurious class action are not bound by the judgment; because they are not represented in or touched by the suit, their due process rights are not affected.

4. ACTIONS — CLASS ACTIONS — SPURIOUS CLASS ACTIONS — ABSENT PARTIES — PRECEDENT.

The decision in a spurious class action may always be used as precedent by class members who were not parties in the original action.

5. APPEAL — FINDINGS OF FACT — CLEAR ERROR — COURT RULES.

The Court of Appeals does not set aside the fact-findings of a trial court unless clearly erroneous (GCR 1963, 517.1).

6. MONOPOLIES — TYING ARRANGEMENTS — ANTI-MONOPOLY STATUTES.

Tying, defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different, or tied, product, or at least agrees that he will not purchase that product from any other supplier, is not specifically prohibited by either the Sherman Anti-Trust Act or the Michigan Trusts, Monopolies and Combinations Act (15 USC 1 *et seq.,* MCL 445.701 *et seq.;* MSA 28.31 *et seq.).*

7. MONOPOLIES — TYING ARRANGEMENTS.

Tying arrangements are unreasonable per se whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected.

8. MONOPOLIES — TYING ARRANGEMENTS — MARKET POWER.

The requisite market power need only be shown in the tying product in order to show that a tying arrangement is unreasonable per se.

9. MONOPOLIES — SHERMAN ANTI-TRUST ACT — RESTRAINT OF TRADE OR COMMERCE — STATUTES.

The basis of illegality under the Sherman Anti-Trust Act is restraint of trade or commerce (15 USC 1 *et seq.).*

10. TRUSTS — RESTRICTION OF TRADE OR COMMERCE — STATUTES.
  Trusts, as defined by the Michigan Trusts, Monopolies and Combinations Act, which create or carry out restrictions in trade or commerce are unlawful, against public policy and void (MCL 445.701 *et seq.*; MSA 28.31 *et seq.*).

*Egnor, Hamilton & Muth,* for plaintiffs Bigos, Dixon and Myers.

*Bodman, Longley & Dahling* (by *James R. Buschmann*), for defendants on appeal.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Mary Louise Albrecht* and *Edwin M. Bladen,* Assistants Attorney General, for intervening plaintiff Attorney General.

Before: DANHOF, C.J., and CYNAR and MAC-KENZIE, JJ.

CYNAR, J. Defendants appeal as of right from the decision of the trial court awarding each of the named plaintiffs $2,000 and imposing a $10,000 fine on defendants. The trial court found that defendants had violated Michigan's Trusts, Monopolies and Combinations Act of 1899. Additionally, the court found, separate from a tying violation, that the charging of a fee for the transfer of tenancy was unconscionable. In ordering the return of a $1,000 fee paid to certain of the defendants, each of the named plaintiffs was allowed a two-fold recovery of that amount under MCL 445.711; MSA 28.38.[1]

_____
[1] The trial court apparently relied on the language of the cited section as in effect when plaintiffs' complaint was filed in March of 1974, as opposed to the language of the statute as amended by 1976 PA 144, effective March 31, 1977, the statute in effect when judgment was rendered, which, in added subsection 2, provided for an award of only actual and proven damages plus reasonable attorney fees and

Defendant Royal Holiday Mobile Home Park (Royal Holiday) is a Michigan partnership with spaces for 436 mobile homes. Defendant Nationwide Mobile Home Parks, Inc., (Nationwide) is a Michigan corporation in the business of selling mobile homes. It is located on the premises of Royal Holiday. Defendant Sheldon Futernick is the controlling and managing partner of Royal Holiday as well as being the president and sole shareholder of Nationwide. In addition, he owns interests in other mobile home parks located in the Detroit metropolitan area, including defendant Holiday West Mobile Home Park, defendant Holiday Woods Mobile Home Park, defendant Holiday Estates Mobile Home Park, and defendant Highland Hills of Highland Mobile Home Park.

Plaintiffs were residents of Royal Holiday. Plaintiffs rented lots in the park on which they placed their mobile homes. It was uncontested that plaintiffs' leases were from month-to-month and that the plaintiffs had no right to sublet or assign. Individuals who rented lots in Royal Holiday and who sought to sell their mobile homes had to pay $1,000 to Nationwide or to Royal Holiday in order to leave their homes set up on the site so that their buyers could lease the same space. Although not specified in the park's written rules, this procedure had been instituted by Nationwide and Royal Holiday and was in effect for several years before this lawsuit was filed. However, the rules and regulations at Royal Holiday did state as follows:

"If the resident wishes to terminate his tenancy, a thirty (30) day written notice shall be given. The landlord may waive this notice requirement at his option.

"Mobile homes that have been sold on a lot must be

costs and which eliminated the language allowing for an award of double the damages sustained.

moved off the premises at time of sale unless the purchaser thereupon applied for his own lease and is granted same by landlord."

Thus, plaintiffs were aware that when they terminated their tenancy with Royal Holiday they would have to remove their mobile homes from the park unless their purchasers were granted leases.

Buyers of mobile homes wanted to purchase homes which were set up on a site. It was easier to sell a home which was set up in a mobile home park. Royal Holiday would assure the transfer of tenancy from the seller of a mobile home in the park to the buyer of the home if the seller paid the $1,000 to Royal Holiday.

In addition, there were expenses and inconveniences involved in moving a home from its site and setting it up on a new one. Removing the skirting, disconnecting the water, sewer, gas and electric lines, attaching wheels to the home, physically moving it and setting it on a new site with new skirting and new bases are steps which made moving a mobile home a costly enterprise. Therefore, a home that was set up and ready for occupancy was more desirable than one which had to be moved.

Plaintiffs Bigos, Myers, and Dixon were month-to-month tenants of Royal Holiday and paid the $1,000 fee. Originally, the case included three other plaintiffs, Michigan Mobile Home Owners Association, William Daughenbaugh and Norman Olesko. Michigan Mobile Home Owners Association was dismissed as a party at the close of the proofs. William Daughenbaugh was a plaintiff only with respect to count I, which was withdrawn at trial. Norman Olesko was dismissed for failure to respond to discovery.

Subsequent to the filing of the original complaint, the Attorney General of the State of Michigan intervened on the side of the plaintiffs.

Although the case was heard by the trial court as a class action, and although the trial court's opinion grants relief to the entire class of persons similarly situated, no class notice was filed and no unnamed members of the class other than the named plaintiffs appeared personally in this case.

GCR 1963, 208.1 provides for three types of class actions. The case for our decision herein is a so-called "spurious" class action, *i.e.,* one in which there are no jointly held rights, but simply common questions of law or fact. See GCR 1963, 208.1(3).

The Michigan Supreme Court in *Grigg v Michigan National Bank,* 405 Mich 148, 174; 274 NW2d 752 (1979), held that a spurious class action is simply "a form of permissive joinder of parties". The Court continued:

"On the basis of the foregoing, we conclude that the judgment in a spurious class action binds only those similarly situated individuals who affirmatively indicate to the court their desire to be included in the class (to 'opt in')."

Later, the Court stated:

"Under Michigan law and procedure, persons who do not affirmatively *join* (opt in) the litigation are not bound. They are not represented in or touched by the suit, so their due process rights are not affected." *Grigg, supra,* 193.

There have been no proceedings in this case whatsoever to invite joinder by absent class members. Under *Grigg,* it is clear that an absent mem-

ber who does not "opt in" is not in any manner affected by the decision in this suit. Absent parties may always use the decision in this case as precedent, but *Grigg* makes it clear that they are not parties to this suit. Therefore, the judgment in the present case only binds plaintiffs Bigos, Myers, and Dixon.

No evidence was offered which linked any defendants other than Royal Holiday and Nationwide to the alleged tying in this case. Aside from the fact that Holiday Woods Mobile Home Park, Highland Hills of Highland Mobile Home Park, and Holiday Estates Mobile Home Park are owned partially or wholly by Futernick, none of these entities have any connection with the transactions complained of and the suit against these entities should have been dismissed.

The trial court, in its opinion, indicated that the arrangement complained of herein was an unlawful tie-in scheme under the Michigan Anti-Trust statute whereby the plaintiffs, in order to secure the lot transfer, were required to purchase a tied-in product, to wit: access to Royal Holiday Mobile Park's brokerage and closing services and the purchase of appraisal services rendered by Nationwide for the benefit of Royal Holiday Mobile Park.

The testimony did not establish that the plaintiffs received or were offered appraisal, closing or other sales related services.

Although this Court does not set aside the fact-findings of a trial court unless clearly erroneous (GCR 1963, 517.1), the statements of Bigos, Myers, and Dixon indicate that, with respect to those three named plaintiffs, the court's finding in this regard was clearly erroneous.

Plaintiff Bigos testified that he was required to pay the $1,000 fee at issue in order to sell his

mobile home in place on Royal Holiday's premises. Although Bigos was not told of the fee until he sold his home, he was aware that as a month-to-month tenant he had no right to assign or sublet his tenancy and that, unless his buyer was granted a lease, his mobile home would have to be removed from the park if he resold.

Plaintiff Myers testified that he was unaware of the fee until he sold his mobile home, that he did not know that his rights as a month-to-month tenant of Royal Holiday were not transferable, and that he knew that he had no right to tell Royal Holiday that it must accept the buyer of his mobile home as its tenant.

Plaintiff Dixon had become a tenant by previously purchasing a mobile home from an existing tenant. He sold his mobile home and paid the fee. At the time he moved into Royal Holiday, he knew of the existence of the fee at issue. He also knew that he had no right to sell any right of occupancy in Royal Holiday mobile Home Park to the purchaser of his mobile home.

Bigos, Dixon, and Myers each testified that they were offered no help in selling their homes by the defendants.

Further, defendant Futernick testified as follows:

"*Q.* Mr. Feternick *[sic]*, let's clear up this confusion. Did you advertise in your sales office any of the homes people were selling themselves in the park?

"*A.* Not the specific homes.

"*Q.* The answer is, no, right, and do I understand your testimony that you didn't prepare any sales agreements or closing papers for people who sold any homes in the park, is that your testimony at the present time?

"*A.* I don't know whether we did is my testimony but we offered the services.

"*Q.* You offered that service to people?

"*A.* Only if people come in and asked for help, in that sense.

"*Q.* Then you would do it?

"*A.* If they said they did, for instance, if they don't know where to finance the home there are certain lenders that are set up for mobile homes. We would tell them where to go.

"*Q.* You did provide that service?

"*A.* If they asked us for it or if they needed it.

"*Q.* In your interrogatories you said you aided the purchaser in obtaining financing.

"Would you do anything else to aid them aside from referring them to a bank?

"*A.* No."

Futernick testified that Nationwide did not keep the $1,000 fees, but that they were forwarded to Royal Holiday. Royal Holiday then paid Nationwide $200 for the appraisal service which Nationwide provided for Royal Holiday. The most one can reasonably infer from Futernick's testimony is that if someone were to ask where he could obtain a loan, the salesmen at Nationwide would direct him to banks which offered loans secured by mobile homes. There was no testimony that such services were ever used by anyone nor was there testimony that such services were offered to the named plaintiffs.

The position of the named individual plaintiffs in the original complaint was that the defendants made no efforts and offered no aid to plaintiffs in arranging the sale of their mobile homes. The proofs support a finding to this effect. The plaintiffs established that the $1,000 fees were paid by the mobile home sellers to the defendants to permit the transfer of the tenancies to the mobile home purchasers.

The trial court found that the fee levied by

defendants for transferring lot tenancy to a buyer was a "tie-in" arrangement which was illegal per se and in violation of the Sherman Anti-Trust Act, specifically 15 USC 1 and 15 USC 2, and the Clayton Act, specifically 15 USC 14.

Section 1 of the Sherman Anti-Trust Act, 15 USC 1, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

The Michigan Trusts, Monopolies and Combinations Act of 1899, MCL 445.701 *et seq.;* MSA 28.31 *et seq.,* provides in pertinent part:

"That a trust is a combination of capital, skill or arts by two [2] or more persons, firms, partnerships, corporations or associations of persons, or of any two [2] or more of them, for either, any or all of the following purposes:

"(1) To create or carry out restrictions in trade or commerce;

* * *

"(5) * * * Every such trust as is defined herein is declared to be unlawful, against public policy and void * * *."

Tying, the restrictive practice at issue, is not specifically prohibited by either the Sherman Act or the Michigan Trusts, Monopolies and Combinations Act, and no Michigan authority has been found specifically holding that tying is a restrictive practice prohibited by the Michigan act.

In *Peoples Savings Bank v Stoddard,* 359 Mich 297, 329; 102 NW2d 777 (1960), the Michigan Supreme Court, without deciding whether or not

tying was prohibited by the act, did state that tying has been held to be a restrictive practice.

The definition of tying is contained in *Northern Pacific R Co v United States,* 356 US 1; 78 S Ct 514; 2 L Ed 2d 545 (1958), where the Court stated:

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. *Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed.* Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co of California v United States,* 337 US 293, 305-306 [69 S Ct 1051, 1058; 93 L Ed 1371 (1949)]. *They deny competitors free access to the market for the tied product,* not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' *Times-Picayune Publishing Co v United States,* 345 US 594, 606 [73 S Ct 872, 879; 97 L Ed 1277 (1953)]. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. *International Salt Co v United States,* 332 US 392 [68 S Ct 12; 92 L Ed 20 (1947)]. Cf. *United States v Paramount Pictures,* 334 US 131, 156-159 [68 S Ct 915, 928-929; 92 L Ed 1260]; *United States v Griffith,* 334 US 100 [68 S Ct 941; 92 L Ed 1236 (1948)]. Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignif-

icant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself. 356 US 5-7." (Emphasis supplied.)

In *Fortner Enterprises, Inc v United States Steel Corp,* 394 US 495, 499; 89 S Ct 1252; 22 L Ed 2d 495 (1969), the Court, citing *International Salt Co v United States,* 332 US 392; 68 S Ct 12; 92 L Ed 20 (1947), stated that tying arrangments are unreasonable per se "* * * whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected."

Concerning market power, defendants contend that because no evidence of Royal Holiday's share of the mobile home market was offered, the *Fortner* requirement of economic power, as an element of tying, is lacking. This argument misconstrues the *Fortner* requirement of economic power. Market power need only be shown in the tying product. In this case, the tying product was the transfer of tenancy and Royal Holiday was the only entity which could decide whether or not to grant tenancy to a resident's buyer. Defendants, therefore did possess the requisite economic market power in the tying product.

The basis of illegality under the Sherman Anti-Trust Act is restraint of trade or commerce. Under Michigan Trusts, Monopolies and Combinations Act, trusts, as defined, which create or carry out restrictions in trade or commerce are declared unlawful, against public policy and void. The common thread of illegality in the cases cited herein is

identified with restraint of freedom of competition. The evidence does not support a finding that any actual or potentially identifiable competition was appreciably, if at all, restrained.

While we may not approve of defendants' manner of doing business as it related to the payment of a fee for the transfer of tenancy, we are not willing to judicially legislate by finding an unconscionable contract on the facts before us. The practice is no longer occurring since a new statute, MCL 125.1128; MSA 19.855(28), which took effect January 9, 1977, provides that the charging of an "exit fee" by mobile home parks is an unfair or deceptive practice.

Reversed without costs or attorney fees.