328 F.2d 265
 140 U.S.P.Q. 500
 PREFORMED LINE PRODUCTS COMPANY, Plaintiff-Appellee,
v.
The FANNER MANUFACTURING COMPANY, Defendant-Appellant.
PREFORMED LINE PRODUCTS COMPANY, Plaintiff-Cross-Appellant,
v.
The FANNER MANUFACTURING COMPANY, Defendant-Cross-Appellee.
 Nos. 15117, 15118.
 United States Court of Appeals Sixth Circuit.
 Feb. 19, 1964.
 
 Richard F. Stevens, Cleveland, Ohio, Patrick H. Hume, Henry L. Brinks, Chicago, Ill., J. Richard Hamilton, Cleveland, Ohio, on brief; Byron, Hume, Groen & Clement, Chicago, Ill., Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel, for Preformed Line Products Co.
 George F. Karch, Jr., Timothy F. McMahon, Cleveland, Ohio, Thompson, Hine & Flory, Cleveland, Ohio, McCoy, Greene, Medert & TeGrotenhuis, William C. McCoy, William C. McCoy, Jr., Cleveland, Ohio, on brief, for Fanner Mfg. Co.
 Before WEICK, Chief Judge, CECIL, Circuit Judge, and PECK, District judge.
 CECIL, Circuit Judge.
 
 
 1
 These appeals involve the validity and infringement of two patents, the scope of a license agreement, misuse of a patent, and purge of that misuse. They arise out of an action commenced in the United States District Court for the Northern District of Ohio, Eastern Division, by Preformed Line Products Company, as plaintiff, against The Fanner Manufacturing Company, as defendant. Jurisdiction was claimed by virtue of Sections 1338(a) and (b) and 1400(b), Title 28 U.S.C. and Sections 281-285, inclusive, Title 35 U.S.C.
 
 
 2
 In an opinion and supplemental opinion of the District Judge, reported at 225 F.Supp. 762 (The original opinion reported at 124 U.S.P.Q. 288), findings were made adverse to both plaintiff and defendant. Both parties appealed from the judgment of the trial court. The defendant is appellant in No. 15117 and the plaintiff is cross-appellant in No. 15118.
 
 
 3
 Thomas F. Peterson, inventor of four patents with which we are here concerned, is president and principal stockholder of Preformed Line Products Company, an Ohio corporation. At the time suit was begun, the plaintiff was the owner of the patents as the assignee of Mr. Peterson. Subsequent to the commencement of the action all of the assets of the defendant were conveyed to Textron, Inc., a Rhode Island corporation, and, simultaneously, Textron, Inc., assumed all of the defendant's liabilities. The defendant corporation has been dissolved and its business has been continued as the Fanner Division of Textron, Inc. The parties will be referred to as Preformed and Fanner or as plaintiff and defendant as they were in the trial court.
 
 
 4
 Two patents are in suit: Nos. 2,609,653 and 2,761,273. They are part of a family of four related patents. As a background for a discussion of the patents in suit, it is necessary to consider the other two patents: Nos. 2,275,019 and 2,587,521. For convenience, the patents are referred to as numbers 1, 2, 3 and 4 and are described as follows:
 
 
 5
 Number Application Issued
 --------- -------------- -------------
No. 1 2,275,019 May 14, 1936 March 3, 1942
No. 2 2,587,521 June 23, 1945 Feb. 26, 1952
No. 3 2,609,653 April 27, 1948 Sept. 9, 1952
No. 4 2,761,273 Sept. 20, 1946 Sept. 4, 1956
 
 
 6
 The patents developed by Peterson relate to the use of helical preformed elements in various reinforcement and anchoring functions involved with power transmission lines and line conductors. The basic element in all the patents is the armor rod which consists of a hard, spring type wire preformed to a helix with a pitch length several times the diameter of the conductor or strand on which it is applied. This simple basic element allows an endless variety of uses which include conductor armor, splices, dead ends, repair coverings, electrical connectors and cable suspenders. These reinforcement accessories are often applied to cables or other suspended wires or bodies to increase their fatigue life. This reinforcement protects them against excessive vibrational and axial movements and abrasion.
 
 
 7
 Patent No. 1 is the basic patent for helical preformed elements used in combination with line conductors. The claims of patent No. 1 define a preformed open helix, having a pitch length several times its diameter and capable of substantial elastic deformation manually whereby it may be laid sideways against the conductor and wrapped around without permanent deformation of the helix, the inside diameter of the helix being substantially equal to the outside diameter of the conductor.
 
 
 8
 Turning now to the questions presented on appeal, we will discuss first the validity of the patents. The Supreme Court has said that due to the greater public importance of the validity of a patent it is the better practice to inquire fully into that issue. Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Maytag Co. v. Murray Corp. of America, 318 F.2d 79, 80, C.A. 6.
 
 
 9
 Validity of Patent No. 3.
 
 
 10
 The trial court determined that patent No. 3 was invalid for double patenting, since the claims read on each other and because no inventive difference existed between patents Nos. 2 and 3. An inventor may not receive more than one patent on one invention. Miller v. Eagle Mfg. Co., 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121; Application of Stanley, 214 F.2d 151, 41 CCPA 956; Hope Basket Co. v. Product Advancement Corp., 187 F.2d 1008, 1012, C.A. 6, cert. den., 342 U.S. 833, 72 S.Ct. 44, 96 L.Ed. 630. 'Under our patent system, based as it is upon statutory monopoly limited to a seventeen year period, it is an inherent principle that an inventor is not entitled to the issuance of two patents at different times for the same invention.' Pierce v. Allen B. Du Mont Laboratories, Inc., 297 F.2d 323, 327, C.A. 3, cert. den., 371 U.S. 814, 83 S.Ct. 24, 9 L.Ed.2d 55.
 
 
 11
 Patent No. 3 has only two claims.[1] It is singularly directed to the use of reinforcements on stranded bodies which have a pitch length greater than the pitch length of the reinforcement. Patent No. 2 has nine claims, also concerned with the direction of lay of the strands of the cable of reinforcement upon the cable of association. Claim 3 of that patent is fairly representative.[2]
 
 
 12
 Patent No. 3 describes the invention as follows: 'This invention relates to helically preformed elements for use in the reinforcement, armoring, connecting and supporting of wires, strands, and the like. In this regard the invention is in furtherance of those disclosed in my prior Patents Nos. 2,275,019 and 2,587,521, (Nos. 1 and 2) and copending applications Serial Nos. 698,312 and 2,200 (Series of 1948).'
 
 
 13
 Patent No. 3 states: 'As is discussed in my prior patent applications, in order to effect the best mechanical and electrical connection between adjacent ends of stranded cables or conductors, it is desirable to preform the helical elements in such a way that the angle and length of the pitch of the helix correspond to the angle and length of lay of the strands of the conductor of association in order that the former may lie between, and track with, any two adjacent strands of the latter where these are of the same hand. By this arrangement the greatest line contact between the helical elements and the conductor strands is realized which develops the highest frictional engagement to resist relative axial displacement between the two, and also provides the greatest areas of contact for the electrical purpose, thereby effecting a union of the highest efficiency in these relationships.'
 
 
 14
 The objective of patent No. 3 was stated: 'The present invention is aimed at curing these defects (the 'tracking' defects of patent No. 2) by providing for a helical element that is preformed with an angle of pitch that is less than the angle of lay of the associated stranded body and with a pitch length that is less than the length of the lay of the latter.'
 
 
 15
 The preliminary question in establishing double patenting is ascertaining whether the patent claims read on each other. 'The courts apparently felt that to have double patenting it was necessary that the claims of the patents cross-read, that is that not only must the practice of the first patent be an infringement of the second but the practice of the second must be an infringement of the first.' Application of Stanley, 214 F.2d 151, 155, 41 CCPA 956.
 
 
 16
 The question here is whether the language employed in the two patents in description of the pitch lengths has essentially the same import. The issue was stated by the District Court: 'whether the 'slightly less' pitch lengths of the claims of Patent No. 3 are patentably distinguishable over the pitch lengths of the reinforcements as defined in the claims of Patent No. 2.' The language used in patent No. 2 to describe the corresponding pitch lengths is predominately '* * * substantially the same. * * *'[3]
 
 
 17
 The District Court determined that 'The term 'slightly less' connotes a small or trivial shortening of the pitch length and does not exclude the least reduction in the length of the pitch of the reinforcement below that of the pitch of the conductor. The term 'slightly less' includes those minimal deviations from precise conformance in the pitch lengths of the reinforcements and the strands as taught in Patent No. 2. The claims of each patent, therefore, read on the other, thus meeting one of the tests of double patenting. * * * Moreover, no good reason appears why, if allowable, the claims in Patent No. 3 could not have been included in Patent No. 2. * * *' We agree that the claims of the patents read on each other.
 
 
 18
 Additionally, two patents may not issue for different forms of the same invention when they are not inventively different, Application of Stanley, 214 F.2d 151, 41 CCPA 956. To sustain the validity of a second patent, the Court said in Miller v. Eagle Mfg. Co., 151 U.S. 186, at 198, 14 S.Ct. 310, at 315, 38 L.Ed. 121, that: '* * * it must distinctly appear that the invention covered by the later patent was a separate invention, distinctly different and independent from that covered by the first patent; in other words, it must be something substantially different from that comprehended in the first patent. It must consist in something more than a mere distinction of the breadth or scope of the claims of each patent.'
 
 
 19
 In a recent discussion of double patenting the Third Circuit said, in Pierce v. Allen B. Du Mont Laboratories, Inc., 297 F.2d 323, at 327: 'Since Miller v. Eagle, courts have repeatedly ruled that an inventor's separate applications embodying the same inventive concept afford proper bases for the issuance of separate patents at different times only if one of them also embodies an additional inventive concept not present in the other. In other words, the difference between the claims of the two applications must itself be inventive.'
 
 
 20
 The trial court held: 'Patent No. 3 involved no new principle and represents no creative thought. It was the mere carrying forward of the original idea of Patent No. 2 to secure the ideal condition of 'tracking' under conditions of actual use. As shown above, this same objective was sought to be accomplished by the practical form of 'near conformance' as disclosed by claim No. 3 of Patent No. 2. The conclusion is inescapable that the 'near conformance' of pitch lengths as taught in Patent No. 2 contemplates a pitch length of the reinforcement 'slightly less' than the pitch of the strands of the conductor.'
 
 
 21
 No inventive difference was disclosed between patents Nos. 2 and 3. The District Court said: 'A slight reduction in the pitch length of the reinforcement represents no more than the application of mechanical skill in the course of natural development of the art. * * * To anyone skilled in the art, it would be obvious that a slight reduction in the pitch length of the helices would eliminate the defects.'
 
 
 22
 As this Court recently stated: 'Whether that impalpable something which distinguishes invention from mere mechanical skill exists is a question often difficult to determine and which cannot be answered by applying the test of any general definition.' Harvey v. Levine, 322 F.2d 481, 485, C.A. 6. Here we agree with the District Court that no substantial distinction can be drawn between patent No. 2 and patent No. 3. Both the objectives and the mechanical principles involved for accomplishing the desired result are not patentably distinguishable.
 
 
 23
 Finally, plaintiff contends that the commercial success of patent No. 3 should 'tip the scale' in favor of validity. Here the plaintiff's sales of armor rods and related products jumped from $31,000 in 1947 to over $3,000,000 in 1957. As this Court recently affirmed in Harvey v. Levine, 322 F.2d 481, C.A. 6, commercial success is a factor to be considered in a doubtful case. This is not a doubtful case, for as this Court said in Harvey v. Levine, 322 F.2d 481, at p. 486, C.A. 6: 'Commercial success without invention will not make patentability.'
 
 
 24
 The trial judge wrote a comprehensive opinion and cited applicable authorities to support his conclusion that patent No. 3 was invalid. We agree with his reasoning and his conclusion and hold that patent No. 3 is invalid.
 
 
 25
 Validity of Patent No. 4.
 
 
 26
 The subject matter of patent No. 4 involves 'dead ends' for cables. The dead end is a device or structure which provides a link between the cable and the point of termination. While the purpose of patents Nos. 2 and 3 was for reinforcement, the purpose of patent No. 4 is that of 'anchoring.'
 
 
 27
 Two categories of dead ends are pertinent to this consideration. The dead ends employed in patent No. 4 and in the infringing device are independent structures attached to the end of a cable providing a link, and a transfer of strain, from the end of the cable to the point of termination. This category of dead end is distinguished from that where the wire or cable is bent back upon itself to form a loop. In this latter type the loop, formulated from the cable itself, provides the means for carrying the load being terminated.
 
 
 28
 The plaintiff alleged in its complaint that the defendant infringed article claims 1, 3, 5 and 8 through 14 and method claims 6 and 15 of patent No. 4. The defense was that these claims were invalid. The trial judge found that all of the claims in suit were valid.
 
 
 29
 The defendant challenges the presumption of validity accorded to a patent under the law,[4] asserting that such presumption could not exist in favor of patent No. 4 over pertinent prior art not considered by the Patent Office. Specifically, the defendant asserts that since the Selquist patent, No. 2,202,538, was not cited as a file reference, the presumption of validity is overthrown.
 
 
 30
 The trial court determined that the presumption of validity was not destroyed merely by the failure to cite pertinent prior art. The court held that the defendant assumed the burden of proving that the reference upon which he relied anticipates the patent in suit or demonstrates lack of invention. We agree.
 
 
 31
 The mere failure to cite pertinent prior art in a patent does not per se destroy the presumption of validity. This Court has held that the statutory presumption is weakened if applicable prior art is not considered by the Patent Office. France Mfg. Co. v. Jefferson Electric Co., 106 F.2d 605, 608, C.A. 6, cert. den., 309 U.S. 657, 60 S.Ct. 471, 84 L.Ed. 1006; Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911, 916, C.A. 6, cert. den., Firestone v. Aluminum Co., 368 U.S. 890, 82 S.Ct. 139, 142, 7 L.Ed.2d 87; Holstensson v. V-M Corp., 325 F.2d 109, 121-122, C.A. 6; Harvey v. Levine, 322 F.2d 481, 484, C.A. 6. This is not to say that the presumption is automatically overthrown. Defendant must do more to invalidate the presumption than merely showing the Selquist patent was not cited by the Patent Office.
 
 
 32
 The defendant based its claim of invalidity on two grounds, anticipation of a prior patent and lack of invention. In support of its claim of anticipation, it cited the Selquist patent, No. 2,202,538. 'In order to anticipate an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single description or structure, where they do substantially the same work in substantially the same way.' Allied Wheel Products v. Rude, 206 F.2d 752, 760, C.A. 6.
 
 
 33
 To establish its claim of anticipation the defendant relies solely upon the dead end illustrated by Fig. 10 of the Selquist patent. The trial judge analyzed the Selquist patent and compared it with the patent in suit. He distinguished Fig. 10 of Selquist from the basic structure of patent No. 4 and concluded that it was not anticipated by Selquist. (Opinion, 225 F.Supp. 762.) We agree that patent No. 4 does not meet the strict test of anticipation.
 
 
 34
 The defendant claims that the trial court erred in refusing to consider cancelled claims 10 and 13 of the Selquist patent as a part of the prior art. The trial court held as a matter of law that the teaching of a prior art patent could not, by reference, be enlarged to include disclosures in claims which the inventor cancelled during the prosecution of his application in the Patent Office.
 
 
 35
 The issue is whether cancelled claims 10 and 13 of the Selquist patent should have been considered as a part of the prior art in the determination of the validity of patent No. 4. A section of the patent statute[5] defines when a person is entitled to a patent. The trial judge said: 'Such cancelled matter secreted in the files of the Patent Office is no more communicated to anyone than if it were merely written out by the inventor and retained in his portfolio.' We find no cases precisely in point on this issue.[6]
 
 
 36
 However, we need not consider the question of constructive or presumptive knowledge, since it appears from the evidence that Mr. Peterson, the inventor, had actual knowledge of these claims at the time he filed the application for patent No. 4. The application for patent No. 1 became involved in an interference with the Selquist application. The entire Selquist application, including cancelled claims 10 and 13, was disclosed to Peterson at the time of the interference. Mr. Peterson would be bound by his actual knowledge and if these cancelled claims alone, or together with other prior art, negatives novelty or invention the patent would be invalid.
 
 
 37
 These claims were introduced into evidence and while the trial judge did not discuss them, we will consider them along with other prior art.[7] The cancelled claims, however, add little to that already disclosed by the Selquist patent. They do not specify a bight formed of helically-shaped elements, as asserted by the defendant. The claims contemplate a helical formation only where the conductor is reinforced. We cannot read in what is obviously not there. Cancelled claims 10 and 13 do not anticipate patent No. 4.
 
 
 38
 The really crucial issue concerning the validity of patent No. 4 is whether it lacks invention by reason of the entire prior art.[8] In Maytag Co. v. Murray Corp. of America, 318 F.2d 79, 81, C.A. 6, this Court said: 'The test of invention where old elements are used in the alleged invention is whether those elements are used in a manner different from the previously known use in such a way that the alleged invention would not have been obvious to one skilled in the art.' This Court also said, in Bede v. Baker & English, Inc., 274 F.2d 833, 839, C.A. 6: 'The combination of old parts or elements, in order to constitute a patentable invention, must perform or produce a new and different function or operation than that theretofore performed or produced by them; it is not sufficient that the combination be superior to what went before in producing a more convenient and more economical mechanism.' See Harvey v. Levine, 322 F.2d 481, 485, C.A. 6.
 
 
 39
 The defendant here asserts that portions of two prior art patents, i.e., patent No. 1 and the Selquist patent, combined to make the invention of patent No. 4 obvious, therefore negativing invention. Defendant contends that 'the failure to so combine Selquist with Patent No. 1 in a consideration of whether Patent No. 4 constituted invention was the primary and fundamental error of law of the District Court.'
 
 
 40
 The District Court held that patent No. 4 disclosed invention over the pertinent prior art. The trial court stated: 'The invention of Patent No. 4 with its plurality of mutually conforming helical elements-- its half-lays and whole lays-- the element of constant open pitch-- the intertwisting of the helices and the coaxial relationship-- the bending of multiple helical elements and the 180 degree relationship of the legs of one helix with the legs of the other-- combine to produce a dead end that is a distinctly useful innovation. The invention has received defendant's tribute of imitation.'
 
 
 41
 The District Court did not fail to consider, as the defendant has asserted, whether the disclosures of patent No. 1 and the Selquist patent together as prior art demonstrated that patent No. 4 was obvious to one skilled in the art. Rather, after extended discussion of patent No. 1 and the Selquist patent, the District Court concluded that the disclosures of patent No. 4 were inventive. (See preceding paragraph.)
 
 
 42
 The essential factual issue is whether the half lay of helical elements disclosed in patent No. 1 is combined with the dead end disclosed in Figure 10 of Selquist so as to make patent No. 4 obvious and the mere application of mechanical skill.
 
 
 43
 The defendant utilized the following analysis: 1. The 'subset' or 'half lay' of helical elements was disclosed by patent No. 1; 2. The intertwisting of the 'half lays' or 'subsets' of helical elements in 180 degree or 'balanced' relationship to form a tubular body was disclosed by patent No. 1; 3. The operation of bending a single half lay back upon itself to form the two half lays necessary to be intertwisted about the conductor was disclosed by the Selquist patent.
 
 
 44
 Patent No. 1 taught the use of the half lay of preformed helical elements. These elements were used for the reinforcement of cables and wires to prevent abrasions and other frictional wear. Two half lays twisted together completely enclosed the conductor. The Selquist patent also demonstrated line conductor reinforcements. However, Figure 10 of that patent illustrates a dead end in which the bight is formed by bending a portion of straight wire integral with the preformed helical elements of the reinforcement of the cable. The dead end of patent No. 4 consists of a half lay of helical elements bent back upon itself to form a bight portion.
 
 
 45
 Considering these elements of the prior art, we agree with the conclusion of the District Court that patent No. 4 constituted invention. The basic idea of using a half-lay of intertwisted helical elements to form this manner of dead end was not disclosed in the prior art. The dead end of patent No. 4 represented a distinct advance in the art of anchoring structures. The reinforcement qualities of the half lay employed in the anchoring structure of the bend back dead end produced a unique and superior function not previously recognized in other dead end devices. In applying the test of invention over prior art, we must bear in mind that hindsight is more revealing than foresight. We conclude that the invention, in combining the pertinent elements of the prior art to form the dead end of patent No. 4, achieved a result not obvious to mere mechanical skill. See Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721.
 
 
 46
 Patent No. 4 represents more than a 'mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them * * *.' Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151, 71 S.Ct. 127, 130, 95 L.Ed. 162. Present was 'that impalpable something which distinguishes invention from mere mechanical skill. * * *.' See Harvey v. Levine, 322 F.2d 481, 485, C.A. 6. We agree with the finding of the District Court that patent No. 4 is valid.
 
 
 47
 Infringement of Patent No. 3.
 
 
 48
 Having determined that Patent No. 3 was invalid, this Court need not pass on the question of infringement.
 
 
 49
 Infringement of Patent No. 4.
 
 
 50
 This question is not presented on appeal. The District Court found: 'The evidence discloses a clear case of contributory and direct infringement of the article and method claims in suit.'Scope of License Agreement.
 
 
 51
 In defense of the charge of infringement, the defendant claimed that it had a license to manufacture dead ends covered by patent No. 4. In 1947 Mr. Peterson entered into identical license agreements with both plaintiff and defendant under patent No. 1 and the application for patent No. 2. These agreements contained the following clause:
 
 
 52
 '5. Peterson further agrees that The Corporation shall, except for any rights that were contracted prior to the issuance of said Letters Patent No. 2,275,019, (No. 1), have the benefits of any more favorable executory terms and conditions that may have been granted, and of any more favorable terms and conditions that may hereafter be granted, to any other licensee in any license by Peterson under said Letters Patent No. 2,275,019, (No. 1), or under said application Serial No. 601,245, (No. 2), or under any Letters Patent that may be granted on that application.'
 
 
 53
 The defendant claimed a license on two grounds: 1. That it was entitled to a license under patent No. 4 by virtue of the 'most favored customer' provision of the 1947 license agreement contained in the above quoted section, and in the alternative, 2. that it had an implied license to make, use and sell the dead ends of patent No. 4.
 
 
 54
 The evidence discloses that the plaintiff paid Peterson royalties on the manufacture and sale of dead ends and other subsetted items during the period 1950-1952. According to the testimony, this was by oral agreement between Mr. Peterson and Albert Bonds of the plaintiff company. The defendant contends that whether or not there was an oral agreement, this was a grant to the plaintiff of more favorable terms and conditions under the license agreement of 1947 than was accorded the defendant.
 
 
 55
 The evidence discloses and the trial court found that the oral license granted to plaintiff was not under either patents Nos. 1 and 2 or application No. 698,312, the parent application of patent No. 4. Patent No. 4 as we have found was a valid patent and covered different subject matter than patents Nos. 1 and 2.
 
 
 56
 Much of the argument of the defendant on its claim of implied license is repetitious of its argument on the validity of patent No. 4. We find no merit to defendant's claim of license on either ground and agree with the conclusion of the trial judge: 'It is clear that the subject matter of the license agreement does not include the invention of Patent No. 4. It is clear also that defendant has no implied license to make, use and sell the dead ends of Patent No. 4. There is no similarity between such dead ends and the dead ends of Patent No. 2.'
 
 
 57
 Misuse of Patent No. 4.
 
 
 58
 Another defense to plaintiff's charge of infringement is that the plaintiff misused the patents in suit by a general abuse of the patent monopoly and by violating Section 3 of the Clayton Act.[9] The District Court agreed as to Patent No. 4.
 
 
 59
 The trial court found facts as follows: The plaintiff's general policy was to refuse to sell to distributors or dealers unless they agreed to sell plaintiff's products exclusively.[10]
 
 
 60
 Regarding a series of business transactions between the plaintiff and the General Electric Supply Co. of Portland, Oregon, the court found that for several years prior to 1956 the General Electric Supply Co. of Portland had distributed plaintiff's products. In 1956 the distributor switched to defendant's products. Plaintiff's sales representatives sought to convince General Electric Supply Company's customers to buy elsewhere, from Preformed products distributors. Treasurer and Sales Manager Schloss succeeded in convincing the General Electric Supply Co. to resume business relations and to deal exclusively with plaintiff.[11] The trial court found that while ostensibly General Electric Supply Co. had the option of dealing exclusively with Fanner or with Preformed, by reason of the severe loss of business due to Preformed's efforts, the dealer really had no alternative but to deal exclusively with the plaintiff.
 
 
 61
 The court enumerated another instance of exclusive dealing in relation to the distributors of Indiana Steel & Wire Co. (This company is also a licensee of the plaintiff under patents Nos. 1 and 2.) The Court found that the Graybar Electric Company was a distributor of the Indiana Steel & Wire Company. Specific instances of the plaintiff's application of its exclusive dealing policy as applied to Graybar 'houses' were referred to in a 'Blind note.'[12] The court found that it was the plaintiff's purpose to enforce the exclusive dealing policy against the Graybar Company of Spokane, Washington.
 
 
 62
 The court found that following the issuance of patent No. 3 (the short pitch armor rod patent herein declared invalid), the plaintiff accepted royalties from Fanner and Indiana Steel and Wire Company on all armor rods manufactured and sold by its licensees. The plaintiff competed with the licensees in the sale of armor rods. The court found in the record no attempt by the plaintiff to restrain competition until after the issuance of the dead end patent No. 4 in September 1956.
 
 
 63
 The trial court accordingly drew the following factual conclusions: (1) After October 1956, the plaintiff embarked upon the policy of restraining competition in unpatented or licensed armor rods by tying the purchase of such devices to the purchase of the patented dead ends; (2) The plaintiff's real purpose was to foreclose competition by its licensees who were its only competitors; and (3) The sale of dead ends to Graybar was conditioned on the purchase by that company from plaintiff of other products not within the protection of patent No. 4.
 
 
 64
 Finally, the court found the economic significance of the plaintiff and the dead end: The plaintiff is the largest manufacturer and seller in the United States of helically preformed reinforcements and attachments for use on electric cables. It is the dominant company in this specialized field, its only competitors (Fanner and Indiana Steel & Wire Co.) being its two licensees. The patent No. 4 dead ends are now widely accepted in the electrical industry, and, therefore, good business practice requires jobbers and distributors of armor rods to carry preformed dead ends in stock.
 
 
 65
 The essential vice complained of here is that the sale of dead ends, protected under patent No. 4, was conditioned on the purchase by the buyer of other helical products not within the protection of this patent. This is the principal question on the issue of misuse. This asserted attempt to condition purchase of unpatented or licensed goods upon the purchase of patented goods can be both a patent misuse (abusive extension of the statutory patent monopoly) and a violation of Section 3 of the Clayton Act (by a tying arrangement). In the proof of illegal tying arrangement under the antitrust laws, the evidence must demonstrate that a party had sufficient economic power to restrain free competition. We treat the questions together.
 
 
 66
 The basic public policy of the patent misuse doctrine was enunciated by the Supreme Court in Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376. The Court said, 320 U.S. at p. 665, 64 S.Ct. at p. 271, 88 L.Ed. 376: 'The grant of a patent is the grant of a special privilege 'to promote the Progress of Science and useful Arts.' Const., Art. I, 8. It carries, of course, a right to be free from competition in the practice of the invention. But the limits of the patent are narrowly and strictly confined to the precise terms of the grant. * * * It is the public interest which is dominant in the patent system.'
 
 
 67
 The Court reaffirmed the doctrine that under the public policy of the patent laws a patentee could not be permitted to enlarge the practical scope of his lawful monopoly by tying other goods and thus restrain competition in goods not covered by the patent. Mercoid v. Mid-Continent Inv. Co., 320 U.S. 661, 664, 64 S.Ct. 268, 88 L.Ed. 376. See Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363.
 
 
 68
 The Supreme Court has defined a tying agreement as: 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.' Northern Pac. R. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545; See Aluminum Co. of America v. Sperry Products, Inc., 285 F.2d 911, 926, C.A. 6, cert. den., Firestone v. Aluminum Co., 368 U.S. 890, 82 S.Ct. 139, 142, 7 L.Ed.2d 87.
 
 
 69
 In an anti-trust context the Court said: 'Where the sale of an unpatented product is tied to a patented article, that is a per se violation since it is a bald effort to enlarge the monopoly of the patent beyond its terms.' White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738. (Citing Mercoid Corp. v. Minneapolis Honeywell Regulator Co., 320 U.S. 680, 684, 64 S.Ct. 278, 88 L.Ed. 396, and International Salt Co., Inc. v. United States, 332 U.S. 392, 395-396, 68 S.Ct. 12, 92 L.Ed. 20.)
 
 
 70
 The Court, in Northern Pac. R. Co. v. United States, 356 U.S. 1, at p. 6, 78 S.Ct. 514, at p. 518, 2 L.Ed.2d 545 stated, (referring to tying arrangements): 'They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. * * *' See White Motor Co. v. United States, 372 U.S. 253, 262, 83 S.Ct. 696, 9 L.Ed.2d 738.
 
 
 71
 Applying the law to the facts, the trial court determined that the plaintiff, by its general policy of tying the purchase of armor rods to the purchase of patented dead ends, was attempting to create a limited monopoly in unpatented devices in contravention of the public policy of the Constitution and laws of the United States covering patents. The court concluded this general policy was also violative of the anti-trust laws, i.e., the Clayton Act.
 
 
 72
 We find that the facts and factual inferences drawn by the trial court are supported by the evidence and are not clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure. Further, we are-in accord with the legal conclusions drawn from those facts and agree that the plaintiff misused its patent monopoly and violated Section 3 of the Clayton Act by the tying arrangement.
 
 
 73
 Next we reach the question of exclusive dealing arrangement. The Supreme Court has set guidelines to demonstrate when an exclusive dealing arrangement violates the anti-trust laws: 'In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Following the guidelines of earlier decisions, certain considerations must be taken. First, the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. Second, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected. * * *
 
 
 74
 'Third, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited * * *.
 
 
 75
 'To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.' Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 328, 329, 81 S.Ct. 623, 628, 629, 5 L.Ed.2d 580.
 
 
 76
 The trial judge discussed the issue of whether the plaintiff had, in violation of Section 3 of the Clayton Act, set up an exclusive dealing arrangement. The court stated: 'Plaintiff had the right to refuse to sell any of its products to General Electric Supply Company. It also had the right to take legitimate and effective steps to prevent distributors from purchasing dead ends from defendant, who was infringing Patent No. 4 by the sale of such devices. However, plaintiff transgressed the bounds of legality by requiring General Electric Supply Company to buy all of its products from plaintiff as a condition of purchasing any products from plaintiff.'
 
 
 77
 The trial court essentially followed the guidelines set out by the Supreme Court as heretofore stated. With the plaintiff's power over the market there can be no doubt that the exclusive dealing arrangements could effectively foreclose competition in a substantial share of the line of commerce affected. The court below determined that 'Plaintiff's real purpose was to foreclose competition by its licensees who were its only competitors.' We agree that this use of an exclusive dealing arrangement violated Section 3 of the Clayton Act.
 
 
 78
 On the basis of the finding of plaintiff's misuse of patent No. 4, it was properly denied relief for infringement by the defendant until it could show that it had wholly abandoned its improper practices and that their consequences had been fully dissipated. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367.
 
 
 79
 Purge of misuse.
 
 
 80
 Between June 12 and 15, 1961, the trial judge heard the parties hereto on supplemental pleadings on the issue of whether the plaintiff had purged itself of misuse of patent No. 4. The defendant in its reply to the plaintiff's supplemental answer on the issue of purge charged the plaintiff with misconduct in its use of patent No. 3 after the court's opinion and findings of fact of January 6, 1960.
 
 
 81
 The trial judge entered an interlocutory order on July 14, 1961, ordering the plaintiff to discontinue in its quotations to customers and potential customers any reference to patent No. 3 and any statement to the effect that no licenses had been granted under patent No. 3. The court found that these statements were misleading and contrary to its determination on the validity of patent No. 3 in its opinion of January 6, 1960. The court further ordered the plaintiff to notify its sales personnel, including all of its sales outlets and customers, of the court's determination regarding patent No. 3 and that no reference thereafter be made to it in its quotations to customers.
 
 
 82
 The defendant claimed that there could be no purge of the plaintiff's misuse of patent No. 4 unless defendant was given a license to manufacture dead ends under it. The plaintiff claimed that the purge should be effective on September 1, 1958 or at the latest on March 1, 1960.
 
 
 83
 The trial judge in a supplemental findings of fact and conclusions of law, filed May 17, 1962, found that the plaintiff took steps to effect a purge as follows: 1. On January 12 and 13, 1960, it distributed to its employees, sales representatives and sales magazines a summary of the court's opinion of January 6, 1960. 2. On January 28, 1960, it notified all of its customers, distributors and jobbers that they were free to buy whatever they wished from plaintiff without any restrictions. Notices were sent to 6601 customers and 1827 distributors and jobbers. 3. On the same date all of plaintiff's sales personnel were instructed to refrain from any direct or indirect attempt at a tie in or exclusive dealer practice. 4. During February and March of 1960, plaintiff published at its expense in seven trade magazines a statement of its sales policy. 5. On February 5, 1960, the plaintiff's Board of Directors, at a special meeting, ratified and confirmed the above action, and, 6. Since the meeting of the Board of Directors, plaintiff has repeated and emphasized its sales policy at staff and departmental meetings and at semi-annual sales meetings addressed by counsel on the subject.
 
 
 84
 The court further found as facts that there was no instance of misuse of patent No. 4 from September 1, 1958, the date Edmund H. Brown became sales manager of plaintiff, through June 15, 1961, the date the purge hearing was concluded, and that no consequences of plaintiff's past misuse of patent No. 4 were continuing on June 15, 1961. With reference to the misleading statements concerning patent No. 3 and the interlocutory order of July 14, 1961, the court found that by July 27, 1961, the plaintiff through various steps had fully complied with the order.
 
 
 85
 The supplemental findings and conclusions of the trial judge are reported in full at 225 F.Supp. 762. We find that the facts found by the trial judge and the factual inferences drawn therefrom are supported by the evidence and are not clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure.
 
 
 86
 In determining whether the plaintiff has purged itself of its misconduct in the use of its patents, the Court must give primary consideration to the rights of the public. 'In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.' International Salt Co., Inc. v. United States, 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20.
 
 
 87
 Before the plaintiff is entitled to relief it must show that it has fully abandoned its illegal practices and that the consequences of those practices have been fully dissipated. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367. These issues present questions of fact. United States Gypsum Co. v. National Gypsum Co., 352 U.S. 457, 465, 77 S.Ct. 490, 1 L.Ed.2d 465. Whether a purge has been effected under the facts of a given case is largely discretionary with the trial court. United States v. United States Gypsum Co., 340 U.S. 76, 89, 71 S.Ct. 160, 95 L.Ed. 89; International Salt Co., Inc. v. United States, 332 U.S. 392, 400-401, 68 S.Ct. 12, 92 L.Ed. 20.
 
 
 88
 The trial judge concluded that the plaintiff had wholly abandoned its improper misuse of patent No. 4 by January 6, 1960, and that the consequences of its misuse were fully dissipated by June 15, 1961; that plaintiff had not misled its customers and potential customers by references to patent No. 3 since compliance with the court's interlocutory order of July 14, 1961, and that any consequences of prior misleading references were fully dissipated by August 1, 1961; that plaintiff became purged of any misuse of patent No. 4 and any misleading reference to patent No. 3 on August 1, 1961; and that plaintiff was entitled to an injunction restraining defendant from infringement of patent No. 4 and an accounting by the defendant for its infringement since August 1, 1961.
 
 
 89
 Both parties here were guilty of wrongdoing, the plaintiff in misusing its patent No. 4 and the defendant in infringing it. We neither reward nor punish either of them for its misconduct.
 
 
 90
 We do not find that the plaintiff in order to purge itself of its misconduct should be required to issue a license to the defendant under patent No. 4. A patentee may confine his patented methods to his own manufacture and is not required to issue licenses to other manufacturers. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. 'Any advantage accruing from this practice is not unlawful, but is attributable to the monopoly conferred by the patent statute.' Sylvania Industrial Corp. v. Visking Corp., 132 F.2d 947, 958, C.A. 4, petition for cert. dismissed, 319 U.S. 777, 63 S.Ct. 1033, 87 L.Ed. 1723.
 
 
 91
 The plaintiff has attempted to fix its own date as to the time the purge was effected. It arrives at this date as the time that it discontinued its illegal practices. That is only a part of the requirement for a purge. The date of the discontinuance of illegal acts can be ascertained with a fair degree of certainty but the date when the consequences of such acts are dissipated cannot be determined with precision. We think the time fixed by the trial judge for the dissipation of the consequences of the misconduct is fair and reasonable and not an abuse of his discretion. See Sylvania Industrial Corp. v. Visking Corp., 132 F.2d 947, 958, C.A. 4. We agree with the trial judge's conclusion on the issue of plaintiff's purge of its misconduct.
 
 
 92
 The judgment of the District Court is in all respects affirmed.
 
 
 
 [1]
 Claim 1. 'In combination with a stranded line, a reinforcing and connecting device comprising a helically-preformed element having helical convolutions for disposition around said stranded line, said convolutions being of the same hand as the strands in said line and being of substantially constant pitch length throughout said element, said pitch length being slightly less than the pitch length of the strands comprising said line when said element is initially positioned thereon, said element being preformed to an internal diameter that is less than the over-all diameter of said stranded line and being elastically expanded to accommodate the latter, said element having a sufficiently open pitch for introduction to the line from its side without exceeding the elastic limit of the material of which said element is made.'
 Claim 2. 'A plurality of preformed elements surrounding a stranded line, each having the characteristics of the combination as set forth in claim 1, said elements being distributed in balanced relation around said line as regarded in right section throughout their co-extensiveness.'
 
 
 [2]
 Claim 3. 'In combination, a stranded cable, a plurality of elongated resilient reinforcing elements preformed into helical configurations of uniform pitch and diameter throughout their length surrounding a portion of said cable, said elements being distributed around said cable as regarded in right section in balanced relation, said elements having a preformed internal diameter smaller than the overall diameter of said cable and a direction of lay agreeing with that of said cable, the pitch length of said elements when positioned on said cable substantially corresponding to the pitch of the lay of the strands in the cable so as to tend to track with the latter throughout a major longitudinal extent of the surrounding portion of cable, and to change the track, if at all, by gradually rising from between two adjacent strands and crossing over to proximate strands at an angle differing but little from the pitch angle of the latter, whereby to effect line contact between the elements of the strands of the cable throughout the major part of their co-extensiveness.'
 
 
 [3]
 Patent No. 2
 Claim No. 1: '* * * substantially the same. * * *'
 Claim No. 2: '* * * the same as. * * *'
 Claim No. 3: '* * * substantially corresponding to the pitch of the lay of the strands of the cable. * * *'
 Claim No. 4: '* * * substantially the same. * * *'
 Claim No. 5: '* * * substantially the same. * * *'
 Claim No. 6: '* * * substantially the same. * * *'
 Claim No. 7: '* * * substantially the same. * * *'
 Claim No. 8: '* * * substantially the same. * * *'
 
 
 [4]
 'A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it.' Section 282, Title 35 U.S.C
 
 
 [5]
 'A person shall be entitled to a patent unless--
 '(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or or
 '(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *.' Section 102, Title 35 U.S.C.
 
 
 [6]
 Related questions have been decided in the following cases: Fessenden v. Wilson, 48 F.2d 422, 19 CCPA 1048, cert. den., 284 U.S. 640, 52 S.Ct. 21, 76 L.Ed. 544; Application of Tenney, 254 F.2d 619, 45 CCPA 894: Hamilton Laboratories v. Massengill, 111 F.2d 584, C.A.6, cert. den., 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444; White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694, C.A.6, cert. den., 346 U.S. 876, 74 S.Ct. 128, 98 L.Ed., 384; Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651
 
 
 [7]
 In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162, the Supreme Court considered evidence upon which neither the trial nor appellate court made any findings
 
 
 [8]
 'A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *' Sec. 103, Title 35 U.S.C
 
 
 [9]
 'It shall be unlawful for any person engaged in commerce * * * to * * * make a sale or contract for sale of goods * * * whether patented or unpatented, for use, consumption, or resale within the United States * * * on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.' Sec. 14, Title 15 U.S.C
 
 
 [10]
 P. H. Schloss, Treasurer and Sales Manager of plaintiff, testified on cross-examination as follows:
 Q. 'All right. What has been the practice of Preformed Line Products Company where a distributor or a jobber may desire to handle Fanner products as a secondary line or a correlated line with Preformed Line Products' devices? What has been your policy-- you are sales manager-- in that regard?
 A. 'I would say that we don't want them selling both products.
 Q. 'That is, you do not want a distributor to sell Fanner Products at all; he is either going to sell all Preformed Line products or he isn't going to sell any; hasn't that been your policy?
 A. 'I would say in general, yes.'
 
 
 [11]
 In a letter of December 10, 1957, to Sales Manager Schloss from John C. Shaffer, a sales representative of plaintiff, Shaffer wrote of 'my discussions with General Electric Supply Company of Portland, forcing their decision whether to go Fanner or Preformed.'
 On the following day, Shaffer wrote to Schloss: 'Phil, with regard to General Electric Supply Company, Portland and Medford, I can give you every assurance that they are now totally 100% Preformed Line Products Company and have discontinued the promotion and sale of Fanner.'
 
 
 [12]
 A letter and memorandum dated April 10, 1958, from the home office to Shaffer and Nelson, plaintiff's sales representative at Spokane, Washington, spoke of the Indiana Steel & Wire Co. distributor, Graybar. The memorandum, styled 'Blind note to P.L.P. personnel' read:
 'The Shaffer & Nelson organization, plus ourselves, have been trying to swing Graybar to the purchase of our materials only. Up to this date, they have wanted to purchase only products not manufactured by Indiana Steel & Wire Company from Preformed and to continue the purchase of their armor rods from the Indiana Steel & Wire Company.
 'Based on this thinking by Graybar, we have refused to ship them any of our products. This approach has worked successfully with a number of other Graybar houses in the country, where we have been able to convince them to purchase all of their products from our company. * * *'