**ADVANCE BUSINESS SYSTEMS AND SUPPLY COMPANY, Appellee,**

v.

**SCM CORPORATION, Appellant.**

**ADVANCE BUSINESS SYSTEMS AND SUPPLY COMPANY, Appellant,**

v.

**SCM CORPORATION, Appellee.**

**Nos. 12901, 12902.**

United States Court of Appeals Fourth Circuit.

Argued May 8, 1969.

Decided Aug. 18, 1969.

Robert G. Levy and Robert S. Paye, Baltimore, Md. (Berryl A. Speert and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for Advance Business Systems & Supply Co.

William E. Willis, New York City (Arthur W. Machen, Jr., Baltimore, Md., J. Marshall Wellborn, New York City, and Alan D. Yarbro, Baltimore, Md., Venable, Baetjer & Howard, Baltimore, Md., and Sullivan & Cromwell, New York City, on brief), for SCM Corp.

Before SOBELOFF, BRYAN and BUTZNER, Circuit Judges.

SOBELOFF, Circuit Judge:

This private antitrust action involves alleged violations by the defendant, SCM Corporation, of sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act. After a non-jury trial, the District Court granted the plaintiff, Advance Business Systems and Supply Company, both treble damages of $50,142 and injunctive relief based on certain of the claimed antitrust violations. SCM appeals from the judgment of liability and in addition challenges as excessive the award of attorneys' fees of $35,875. Advance cross-appeals, contending that the District Court erred in failing to find additional antitrust violations and in failing to award damages claimed by the plaintiff in respect to them. Because both parties are appealing from the judgment of the District Court, they will, for clarity, be referred to in the opinion as plaintiff and defendant.

Defendant SCM is a New York corporation which manufactures and sells, among other products, office copying machines and the paper and other supplies used in the machines. Advance, the plaintiff, is a Maryland corporation formed in 1964 to distribute paper and supplies for copy machines, primarily in the Baltimore area. It is a franchised dealer for Nashua Corporation, a manufacturer and distributor of such paper and supplies on a nationwide basis.

As the findings of the District Court indicate, the office copying machine market is actively competitive, with customers changing readily from one copier to another. Manufacturers and distributors supply many different models of copy machines using a variety of copying processes. Xerox Corporation, the industry leader, markets the only machines using the "indirect electrostatic process";[1] in 1967 it controlled approxi-

---

1. In the electrostatic process, the surface of the original (the document or other object to be copied) is exposed to light and reflected onto an electrically charged surface. Xerox copy machines, using the "indirect" process, reflect the light from the original onto an electrically charged drum, where the image is formed by brushing with a powder toner. This image is then transferred to copy paper, which may be ordinary bond paper.

All other electrostatic copiers use the "direct" copying process, in which light

mately 60% of the office copying market in the United States. SCM, utilizing the direct electrostatic process in its copiers, has about 3% of the market, measured either by the number of machines sold or rented or by the total number of copies made annually on the several brands of machines.

Since the sale of supplies, particularly paper, is often more profitable than the sale or rental of the machines themselves, competition is especially sharp in this branch of the copying industry. SCM copiers, employing the direct electrostatic process, will make copies only on special coated paper, sold by SCM and other manufacturers and distributors, including the plaintiff. In 1967, SCM sold about 13% of all copies made on direct electrostatic machines; a number of other manufacturers of direct electrostatic copying equipment, including Dennison and Bruning, had larger shares of the market. SCM's share of the market has been shrinking since 1964, when it sold approximately 37% of all direct electrostatic copies.

SCM and other manufacturers make copy machines available on three alternative bases: purchase, rental, or lease from an independent leasing company. Customers who rent machines generally pay on a "machine click" or "copy service" basis, the rental varying with the number of copies actually made on the particular machine. Copying supplies for use with the machines are sold both by machine manufacturers and by paper manufacturers which, like Nashua Corporation, produce coated paper designed for use in the various machines.

SCM sells most of the supplies used with SCM copiers, but since 1965 it has faced increasing competition in this area, particularly from Nashua Corporation and its dealers, including the plaintiff. The District Court found that approxi-

mately 90% of the competition SCM encountered in the sale of electrostatic paper in Maryland was from Nashua.

In the present litigation, Advance challenges a number of SCM's practices in the copy supply market as forbidden under the antitrust laws. The complaint alleged that SCM by various actions unreasonably restrained trade; that it attempted to monopolize and conspired to monopolize trade in the manufacture and sale of electrostatic copying supplies; and that it impermissibly tied sales of its electrostatic copying paper to its machines, other supplies, service contracts, and warranties. The District Court found that SCM had violated the antitrust laws in three respects, all involving tying arrangements made illegal either by section 3 of the Clayton Act or by section 1 of the Sherman Act. SCM contests that judgment here.

## I. Tying Arrangements

Tying arrangements may be defined as agreements under which the vendor will sell one product only if the purchaser agrees to buy another product as well. As a result, competition is curbed in two ways. First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement. Whenever a tie-in is successful, competition is inevitably curtailed; moreover, tie-ins can rarely be justified for they "serve hardly any purpose beyond the suppression of competition." Standard Oil Company of Cal. & Standard Stations v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949).

For these reasons, tie-ins have been held illegal under both section 3 of the Clayton Act [2] and section 1 of the Sher-

---

is reflected from the original onto a special coated copy paper which has been electrically charged. The visible image is formed on the coated paper by a liquid "toner," and the copy is dried in the machines. This process requires the use of special copy paper.

2. Section 3 of the Clayton Act, 15 U.S.C. § 14, provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or oth-

man Act. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958) (§ 1); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (§§ 1 and 3); International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (§ 3). The standards of illegality under the two statutes are not identical, however, and therefore the tying practices of SCM found illegal by the District Court must be examined separately in light of the particular statute applicable to each specific arrangement.

Two of the three challenged practices to be discussed involve tie-ins between rented SCM machines and SCM supplies and are therefore covered by the Clayton Act, which applies only to tie-ins involving "goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C. § 14. In the third arrangement, however the sale of SCM paper is tied to SCM service contracts, which do not come within the terms of the Clayton Act. To establish liability, the latter practice must, therefore, be shown to be "unreasonable" under section 1 of the Sherman Act.[3]

### A. *The Clayton Act*

 In section 3 of the Clayton Act, Congress singled out tying arrangements and "authoritatively determined that those practices are detrimental where their effect may be to lessen competition." Standard Oil Co. of Cal. & Standard Stations v. United States, 337 U.S. 293 at 311, 69 S.Ct. 1051 at 1060. If a transaction may be characterized as a

tie-in between items covered by the Clayton Act, therefore, it is automatically illegal under section 3 whenever "a substantial volume of commerce in the 'tied' product is restrained." Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 608, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

### 1. *The Model 55*

The first antitrust violation found by the District Court in the present case involved SCM's practice of marketing its Model 55 copier solely on a "copy service" basis. Under this plan, the customer pays a single charge based on the number of copies run on the machine as recorded by a meter, and supplies and service are included in the single charge. Since the plan forecloses all competition for supplies to be used with Model 55, the District Court concluded that it was illegal "unless and until Model 55 is also offered for rental on a reasonable basis without the requirement that SCM paper be purchased."

On appeal, SCM urges that this conclusion is erroneous in four respects. First, it contends that the "copy service" plan is not illegal because each of its components—machine and paper—is separately available, and "where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." Northern Pacific Ry. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518, n. 4 (1958).

██ Although Model 55 was originally distributed only on a copy service

---

er commodities * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Although the literal terms of section 3 refer to exclusive dealing contracts, it has been interpreted as applying to tying

conditions, which "operates in the manner forbidden by the statute." International Business Machines v. United States, 298 U.S. 131, 135, 56 S.Ct. 701, 703 (1936).

3. Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," but the statute has been construed as proscribing only those restraints on trade which are "undue" or "unreasonable." Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

basis, the District Court found that since March 1, 1967, the machine has also been offered separately for sale and lease.[4] Purchase of a copying machine for $4250, however, is clearly not the economic equivalent of rental at a charge of approximately $.035 per copy. The lease arrangement which SCM suggests as a theoretical alternative to rental (there is no indication in the record that a Model 55 has in fact ever been leased) envisages an intermediate sale of the machine by SCM to an independent leasing company, which in turn leases the machine to the customer. The record is devoid of evidence that such a leasing arrangement represents a reasonable alternative to direct rental by SCM to the user of Model 55, in respect to price, machine maintenance and service, or practical availability. Consequently, Model 55 and SCM supplies cannot realistically be regarded as separately available to SCM's customers. Tie-ins are non-coercive, and therefore legal, only if the components are separately available to the customer on a bais as favorable as the tie-in arrangement.

■■ In its next argument, SCM asserts that the copy service tie-in is not illegal because the District Court did not find that SCM had any economic power over the tying product, the Model 55 copier. In so aguing, however, SCM ignores the distinction between standards of illegality under the Clayton Act and those established by the Sherman Act. In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 608–609, 73 S.Ct. 872, 880 (1953), the Supreme Court clearly pointed out the difference:

> When the seller enjoys a monopolistic position in the market for the "tying" product, or if a substantial volume of commerce in the "tied" product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred.

And because for even a lawful monopolist it is "unreasonable, per se, to foreclose competitors from any substantial market," a tying arrangement is banned by § 1 of the Sherman Act when both conditions are met. (Emphasis in the original.)

Congress singled out tie-ins for special treatment in the Clayton Act upon the generally accepted view that they rarely have any function other than suppression of competition. For the same reason, a seller's successful imposition of a tying arrangement on a substantial amount of commerce may be taken as proof of his economic power over the tying product. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514 (1958). The Clayton Act therefore requires no separate showing of economic dominance where a tying arrangement affects sufficient commerce.

SCM further argues, however, that Advance has not shown that substantial commerce in the tied product—copying supplies—is restrained by the arrangement. At trial, Advance showed only that in the course of selling its own supplies in the Baltimore area, it "discovered" the Model 55 in eight locations, and SCM contends that this cannot support the District Court's finding that "a not insubstantial amount of interstate commerce in the tied product is affected" by the copy service plan.

■ SCM misconstrues the District Court's finding, which is not limited to foreclosure of that portion of the market in which the plaintiff and defendant are actual competitors. As the Supreme Court recently said in Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 502, 89 S.Ct. 1252, 1258 (April 7, 1969):

> Congress has encouraged private antitrust litigation not merely to compen-

4. With respect to the Model 55 tying arrangement, the District Court considered only antitrust violations occurring after March 1, 1967, since "plaintiff has not proved any damage to it with respect to any Model 55 prior to March 1967."

sate those who have been directly injured but also to vindicate the important public interest in free competition. [citation omitted] For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, therefore, *the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit.* (Emphasis added.) [5]

In the present case, the District Court found that in 1966 SCM sold approximately 200 million sheets of paper to be used with Model 55's under copy service. At a copy service charge of approximately $.035 a copy, the aggregate revenue from this source was $7,000,000. Clearly this represents a substantial volume of commerce. See Fortner Enterprises, Inc. v. United States Steel Corp., *supra* (almost $200,000 not insubstantial); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) ($500,000).

SCM's final contention with respect to the copy service plan is that Advance did not demonstrate that it was harmed or threatened with harm by the copy service plan. Such a showing is a prerequisite to a private antitrust action seeking treble damages under section 4 of the Clayton Act or injunctive relief under section 16.[6] The District Court, however, found that Advance suffered $16,714 in single damages as a result of SCM's restrictive practices, and there is ample support in the record for this finding.

Although the court did not segregate the damages or assign partic-

ular dollar losses to each of SCM's different restrictive practices, it did specifically find a "probable loss of some sales of paper for use with the few Model 55 machines proved to have been in copy service in Baltimore." The court further concluded that "SCM's copy service plan denied plaintiff the opportunity to compete for this business." The plaintiff's burden of proving the fact of damages under section 4 of the Clayton Act is satisfied by the showing of *some* damage arising from a given antitrust violation; further proof is relevant only to the amount, and not the fact of damage. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Since the plaintiff's total exclusion from the Model 55 supply market constitutes "threatened" as well as past damage, the court's grant of injunctive relief was justified under section 16 of the Act.

### 2. *Other Rental Agreements*

The District Court also found that SCM illegally imposed tying arrangements on direct lessees of its other copier models, Models 33, 44, 66, and 88, by threatening to cancel the rental agreements and falsely representing that competitive supplies used by the lessees were damaging the rented machines.

SCM's rental agreements for copiers other than Model 55 include a provision that "supplies which may cause damage or deterioration will not be used in the machines." We agree with the District Court's conclusion that such a clause is itself not unreasonable, since it is designed to avoid damage to the lessor's property. International Salt Co. v. United States, 332 U.S. 392, 397, 68

---

5. A still more recent expression of the Court's keen concern with the public interest attaching to private antitrust litigation is Utah Public Service Comm'n v. El Paso Natural Gas Co., et al., 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed.2d 474 (1969).

6. Section 4 of the Clayton Act, 15 U.S.C. § 15, provides

 Any person who shall be injured in his business or property by reason of any-

thing forbidden in the antitrust laws may sue therefor in any district court * * *

Section 16 of the Act, 15 U.S.C. § 26, provides

 Any person, firm or corporation, or association shall be entitled to sue for and have injunctive relief * * * against threatened loss or damage by a violation of the antitrust laws * * *

S.Ct. 12 (1947). An illegal tying arrangement may be shown to exist, however, even where it is not imposed by means of an express contractual provision. The presence of the illegal condition may be inferred from an extrinsic course of conduct supplementing the written contract. Osborn v. Sinclair Refining Co., 286 F.2d 832 (4th Cir. 1960); McElhenney v. Western Auto Supply Co., 269 F.2d 332 (4th Cir. 1959).

In the present case, the District Court found that through persistent and deliberate misrepresentations, sabotage, and threats of cancellation, SCM effectively used the "damage or deterioration" clause in the rental agreement to coerce lessees to use only SCM supplies in their rental machines.

Although, as the court specifically found, Nashua paper is no more likely than SCM paper to damage SCM machines, SCM representatives informed customers that

> the use of Nashua supplies would cause service calls and interrupt the continuous operation of their SCM machines * * * [and they did so] for the purpose of inducing them to cease dealing or to refrain from dealing with the plaintiff.

Specific instances of misconduct by SCM representatives were shown at trial and accepted by the trial judge as part of a consistent course of conduct by SCM:

> It was the policy of defendant from at least as early as August of 1965 and continuing through until the date of trial to threaten the cancellation of rental agreements with customers who used competitive supplies in their SCM machines. This policy was communicated to SCM machine lessees, who were customers and prospective customers of competitive suppliers, including the plaintiff.

The District Court concluded that the plaintiff had been damaged by the illegal tying arrangement imposed as a result of SCM's actions.

■ SCM maintains that an illegal tie-in contract cannot properly be inferred from its conduct with respect to the rental agreements. Reiterating arguments raised in the copy service context, SCM asserts that it had no economic power over the tying product, the rented machines, and that in any event there could be no tie-in where the machines and supplies could be *purchased* separately. As we have explained in the earlier context, purchase is not the economic equivalent of rental, and no showing of economic power is required to establish a violation of the Clayton Act.[7]

■ SCM also insists that the court could not determine that an illegal tying arrangement had been imposed by SCM in light of its own finding that no rental agreements in Maryland were actually terminated by SCM because of a customer's use of competitive supplies. The fact that an agreement is leniently administered, however, does not necessarily lessen, and certainly does not eliminate, its restrictive effect on competition. The overhanging threat of enforcement is ever present, and implied agreements, like express contracts, may be "held over the heads of vendees [and] deny defendant's competitors access to the fenced-off market on the same terms as the defendant." Northern Pacific Ry. v. United States, 356 U.S. 1, 12, 78 S.Ct. 514, 521 (1958); International Salt Co. v. United States, 332 U.S. 392, 398, 68 S.Ct. 12 (1947).

### B. *The Sherman Act*

■ The third antitrust violation found by the District Court pertains to an arrangement by which SCM tied its service contracts to the sale of SCM paper and supplies. Section 3 of the Clayton Act is not applicable when either the tying or tied product is a service, and

---

7. With regard to both the rental agreements and the service maintenance contracts, the District Court's finding that a substantial amount of commerce is affected is not questioned by the defendant and is amply supported by the record.

the court's conclusion that the tie-in was illegal was based on section 1 of the Sherman Act.

SCM provides service for SCM machines in several ways. For customers not already receiving free service contracted for under rental and copy service programs, or under the terms of sale guarantees, service is available on either a time and material basis or under a service maintenance contract. Under the service maintenance contract, SCM agrees to furnish unlimited service for the contract's duration, to replace most defective parts without charge, and to make regular inspections, all for a single annual fee.

Service is extended on a time and material basis whether or not a customer is using SCM supplies with his SCM machine. Similarly, before April 15, 1963, the flat fee service contract contained no restrictions relating to the use of competitive supplies. Since then the contract has been amended and at present contains the following two clauses:

> Because SCM photocopy machines are designed to give excellent performance with SCM photocopy supplies, including Microstatic Dispersant, Replenisher, and Electrostatic Copy Paper, SCM reserves the right to suspend this agreement as to any machines in which other suppliers' paper or other supplies have been used.

> This agreement shall not apply to any repairs made necessary by the use in SCM photocopy machines of dispersant, replenisher, electrostatic copy paper or other photocopy supplies made by other than SCM and not approved by SCM for use in SCM equipment.

Notably, SCM has never approved any competitive paper for use in SCM machines, although, as the District Court found, SCM officials know that Nashua paper is "safe and as effective as SCM paper for such use." In effect, therefore, the service contract is tied to the sale of SCM supplies.

Under the Sherman Act, tying arrangements are *per se* illegal

> whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product *and* a "not insubstantial" amount of interstate commerce is affected. (Emphasis added.) Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 499, 89 S.Ct. 1252, 1256 (1969).

In the present case, the District Court concluded that the "competitive supplies" clauses in the service contract gave rise to a *per se* violation of the Sherman Act, and we are in agreement with that judgment.

In one respect, however, we find the court's reasoning inconsistent with both the law and its own general conclusion as to the illegality of SCM's conduct in connection with the service contracts. In analyzing SCM's practices, the District Court correctly decided that a violation of section 1 of the Sherman Act occurred when SCM employees utilized the competitive supplies provisions in the service contract to coerce customers to use only SCM supplies. Our only disagreement with the court arises from its conclusion that the restrictive provisions of the service contract were not invalid on their face. The court reasoned as follows:

> The antitrust laws do not require SCM to furnish service at a flat rate under its service agreement when other than SCM supplies are used, provided SCM is willing to furnish service in such cases at a fair rate on a time and material basis. But the antitrust laws do not allow SCM to misrepresent the effect of the agreement or the reasons for malfunctioning of the machines as part of a plan to force customers to abandon the use of competing supplies which do not damage the machine.

In antitrust terms, the judgment that the restrictive clauses are themselves reasonable is not warranted

by the contract language prohibiting use of competitive supplies. The court specifically concluded that

> SCM was legally entitled to cancel the flat rate service agreement unless SCM supplies were used, provided SCM was willing, as it was, to offer service at a reasonable price on a time and material basis.

The misrepresentations, sabotage, and threats of cancellation by SCM employees, which the court describes, were intended to disparage competitive supplies and thereby induce customers to use only SCM supplies. As antitrust law provides and as the court properly concluded, the imposition of such a condition is illegal. However, the tying arrangement is no less invalid when it is written into a formal contract than when it is imposed by means of coercive or fraudulent practices. The court's reasoning relative to SCM's informal practices is equally applicable to the contract clauses themselves. We have here both illegally restrictive contract language and conduct designed to enforce the illegal restrictions—all in violation of the Sherman Act.

In its cross-appeal, Advance presents arguments for finding the cancellation and repairs clauses unreasonable as written. The plaintiff asserts that the clauses, which clearly tie the service contract to the sale of SCM supplies, were not motivated by legitimate reasons, such as the difficulty of servicing machines which use unfamiliar supplies, but were adopted and imposed on the customer solely for anti-competitive purposes. Therefore, asserts Advance, the clauses themselves are illegal, for the accepted principle is that tying arrangements "serve hardly any purpose beyond the suppression of competition," and that

> such nonanticompetitive purposes as these arrangements have been asserted to possess can be adequately accomplished by other means much less inimical to competition. Northern Pacific Ry. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 518 n. 5 (1958).

Where, as here, the seller establishes no business reason for imposing the tying arrangement, Advance argues that the court must find it illegal.

Advance is correct in claimin that SCM has failed to establish a legitimate reason for the tying clauses. The District Court found significance in the fact that they were added to the contract at the insistence of the sales department rather than the service department. Accordingly, it concluded that

> the competitive supplies clauses, authorized by SCM's national sales department, were designed to be used as a lever to coerce customers to use only SCM supplies. The service agreement was actively and intentionally used for that purpose by field personnel.

Use of tying arrangements as an anti-competitive device is the very behavior which the antitrust law of tie-ins is designed to prevent. Northern Pacific Ry. v. United States, 356 U.S. 1, 8, 78 S.Ct. 514 (1958). Therefore, the District Court's reasoning that the service contract arrangement is *per se* illegal under the Sherman Act applies to the contract clauses themselves as well as to the coercive conduct of SCM employees.

SCM asserts, however, that the flat fee service arrangement cannot give rise to a *per se* violation of the Sherman Act because there is no showing that SCM has "sufficient economic power with respect to the tying product," a necessary element of *per se* illegality. It thus challenges the District Court's finding that SCM had "sufficient economic power to permit it to use its * * * agreements * * * as tying products or vehicles to coerce the sale of paper."

Although it is impossible to state with precision a general rule as to what constitutes "sufficient economic power over the tying product" to render a tie-in illegal, it is clear that no actual economic dominance need be shown:

> Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's

desirability to consumers or from uniqueness in its attributes. United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962).

Some courts and commentators have assumed that at present there is no real distinction between the standards of the Clayton Act and the Sherman Act, and that if a tying arrangement is successfully imposed on a "not insubstantial" amount of commerce, a violation of both statutes results.[8]

In its most recent pronouncement on tying arrangements under the Sherman Act, the Supreme Court comes close to adopting this position.[9] In Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 503–504, 89 S.Ct. 1252, 1258 (1969), the Court states:

> These decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally serve no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidating the tie. Such appreciable restraints result whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market. * * * *Accordingly, the proper focus of concern is whether the seller has the power to raise price, or impose other burden-*

*some terms such as a tie-in, with respect to any appreciable number of buyers within the market.* (Emphasis added.)

In analyzing the facts of *Fortner* itself, however, the Court went beyond a simple inquiry into the success or failure of the tying arrangement to assess the "special economic power" of the defendant and the "uniqueness" of the tying product.

The Court's approach in *Fortner* indicates that there are situations in which the mere showing of a tie-in's success may be an inadequate basis from which to infer the seller's control over the tying product. In *Fortner* itself, the plaintiff in the antitrust suit was the only buyer subject to the challenged tying arrangement. The lower court reasoned that, in the circumstances, the plaintiff's acquiescence in the arrangement was not sufficient to prove the defendant's "economic control with respect to buyers generally." 394 U.S. at 499, 89 S.Ct. at 1256. Since the plaintiff had not shown the defendant's power over the tying product in any other way, the trial court there concluded that there was no illegal tie-in.

Although the Supreme Court reversed the lower court, it recognized the validity of its reasoning that no inference could be drawn from a single buyer's acceptance of the tie-in. The Court therefore rested its finding that the seller had sufficient power over the tying product on a factual assessment of the product's "uniqueness" and "desirability" rather

8. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 521, 89 S.Ct. 1252, 1268 (1969) (Fortas, J., dissenting):

> But *Northern Pacific*, in effect, applied the same standards to tying arrangements under the Sherman Act as under the Clayton Act, on the theory that the anticompetitive effect of a tie-in was such as to make the difference in language in the two statutes immaterial.

And see Northern Pacific Ry. v. United States, 356 U.S. 1, 7–8, 78 S.Ct. 514 (1958); Lessig v. Tidewater Oil Co., 327 F.2d 459, 470 (9th Cir. 1964); American Bar Ass'n, Antitrust Developments 1955–68 at 107 (1968); M. Handler, Recent Antitrust Developments, 13 The Record 417, 420 (1958) (The Association of the Bar of the City of New York); D. Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L.Rev. 50, 64 (1958); Note, 74 Yale L.J. 691, 693 (1965).

9. Justice White's dissent explicitly declares what is implicit in the majority opinion when he challenges the Court's holding that "buyers' acceptance of the tie-in—the simple fact that there are customers—will always suffice to prove market power in the tying product." 394 U.S. at 518, 89 S.Ct. at 1266.

than on mere success in imposing the tie-in.[10]

Moreover, *Fortner* suggests that even where an "appreciable number of buyers" are involved, the effectiveness of a tie-in may not always show the seller's economic power because it is possible that some tie-ins serve "legitimate business purposes." 394 U.S. at 506, 89 S.Ct. 1252. Although adjudicated tie-in cases and scattered dicta suggest that there are only a few such legitimate purposes,[11] their existence precludes reliance on a flat rule which would make all successful tie-in illegal.

 Under *Fortner*, therefore, unless the defendant can show legitimate business reasons for a tie-in,[12] the "sufficient economic power" test of *per se* illegality is satisfied when it appears that the seller has the power to "impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." 394 U.S. at 504, 89 S.Ct. at 1259. This is not a new standard, for the Court has previously recognized that extensive imposition of a tie-in may sufficiently indicate a seller's economic control over the tying product, at least when "no other explanation has been offered for the existence of these restraints." Northern

Pacific Ry. v. United States, 356 U.S. 1, 8, 78 S.Ct. 514, 519 (1958).

In the case before us, the District Court found that the tying arrangement was imposed to increase sales rather than to serve a legitimate purpose such as the preservation of good will or the protection of a new industry. The District Court's well-supported, extensive and clear-cut findings of sabotage, misrepresentation, and threats of cancellation underline the fact that the clauses in the service contract were an integral part of a pattern of anticompetitive behavior.

The District Court's findings that SCM imposed the service contract tying arrangement in order to coerce customers to use only SCM supplies effectively rule out the possibility of any "legitimate business purpose" for the tie-in. The Supreme Court's conclusion in the *Northern Pacific* case is therefore applicable here:

So far as the [defendant] was concerned its purpose obviously was to fence out competitors, to stifle competition. While this may have been exceedingly beneficial to its business, it is the very type of thing the Sherman Act condemns. In short, we are convinced that the essential prerequisites for treating the defendant's tying ar-

10. In the *Fortner* case, prefabricated houses supplied by United States Steel Corporation were tied to loans made by its wholly-owned subsidiary, the U. S. Steel Homes Credit Corporation. Discussing the seller's power over credit, the tying product, the Court noted that the houses cost the buyer more than the going market rate, a *disadvantage suggesting* some special economic power in the seller. The Court also referred to the seller's unique financing offer, amounting to 100% of the purchase price of the land to be acquired, offered at low interest. To the Court, these facts suggested the seller's "unique economic advantages over his competitors." 394 U.S. at 505, 89 S.Ct. at 1259.

11. Tying arrangements may be legitimate in order to preserve good will when the seller's tying product works satisfactorily only in conjunction with another product made by the seller, or to protect a new business. Good will: Dehydrating

Process Co. v. A. O. Smith Corp., 292 F.2d 653 (1st Cir. 1961), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); Standard Oil Co. of Cal. & Standard Stations v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). New business: United States v. Jerrold Electronics Corp., 187 F. Supp. 545 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961); White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

12. Once the existence of a successful tie-in is shown, the defendant has the burden of showing a legitimate business reason for imposing the condition. United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 548 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755 (1961); Comment, 62 Mich.L.Rev. 1413, 1422 (1964); see Northern Pacific Ry. v. United States, 356 U.S. 1, 8, 78 S.Ct. 514 (1958).

rangments as unreasonable *"per se"* were conclusively established below and that the defendant has offered to prove nothing there or here which would alter this conclusion. 356 U.S. at 8, 78 S.Ct. at 519.

 SCM's service agreement, as written, explicitly prescribes a tying condition. No acceptable business purpose underlies this condition, but, as the District Court found, it was incorporated in the contract only to suppress competition in copying supplies. Acquiescence in the burdensome term by an appreciable number of customers gives rise to an inference that SCM had "some power over some buyers" in the market.[13] Consequently, the tying arrangement is *per se* illegal under section 1 of the Sherman Act.

## II. *Other Antitrust Violations*

 In its cross-appeal, Advance complains of error in the District Court's failure to find further antitrust violations arising from SCM's behavior in the office copy supply market. The court concluded that neither the *sale* of SCM machines nor the guaranty accompanying such sales had been conditioned on the purchase of SCM supplies, and the record fully supports this conclusion. The court did find that during 1964 the sale ot paper had been tied to the sale of toner used in the copying machines. However, the two items are at present sold separately at reasonable prices, and the court held that regardless of any damage that may have been suffered by others, the plaintiff showed no damage from the earlier tie-in. We find no error in this regard.

 Advance also alleged in its complaint that SCM attempted to monopolize and conspired to monopolize interstate commerce in the sale of paper for its copying machines, in violation of section 2 of the Sherman Act. The court concluded that SCM had not attempted to monopolize the relevant submarket—sale of coated paper for all "direct" electrostatic copiers; SCM sells paper only for use in SCM machines. The court properly held that paper for use in SCM machines is not a relevant market or submarket, since all "direct" electrostatic copiers are reasonably interchangeable. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). We agree with these conclusions in all respects.

### III. *Damages*

The District Court assessed the plaintiff's damages arising from SCM's illegal tying arrangements at $16,714. Under the statute, 15 U.S.C. § 15, the damages were trebled. The damages were primarily based on costs incurred by Advance in mitigating the effect of SCM's restrictive practices, and were described by the court as follows:

> All factors considered, the Court has concluded that the fair measure of damages to plaintiff in this case is the reasonable cost of furnishing service to those customers of plaintiff who purchased paper and other supplies for use in SCM machines, plus the value to plaintiff of Elkins' [President of Advance] time spent in offsetting defendant's restrictive practices. The sum of those two items fairly covers plaintiff's actual damages, including the small loss of specific sales which plaintiff proved and the probable loss of some sales of paper for use with the few Model 55 machines proved to have been on copy service in Baltimore.

The record satisfies us that the court's findings with respect to the damages actually awarded are not clearly erroneous. However, regarding one item of damages not awarded by the court, the loss of Commercial Credit business, its basic factual findings and our decision today concerning the service contract tie-in

---

13. The District Court found that approximately 25% of SCM machine owners and lessees in the Baltimore area had entered into service maintenance contracts imposing the tying condition.

compel a modification of the damage award.

█ At trial, the plaintiff showed and the court affirmatively found that "the plaintiff was wrongfully deprived of the sales actually made by SCM to Commercial Credit." These sales of paper and supplies were lost because SCM threatened to cancel Commercial Credit's service contract if it continued to use Nashua supplies sold by Advance. The court, concluding that by the terms of the contract "SCM was legally entitled to cancel the flat rate service agreement unless SCM supplies were used" and therefore that the threat to cancel was not an antitrust violation, awarded no damages for the lost sales. Our decision, as set forth above, that it was error not to hold the cancellation clause itself illegal as a tie-in will require the award of additional damages for the lost Commercial Credit sales.

## IV. *Attorneys' Fees*

Finally, both parties object to the amount of the attorneys' fees awarded by the court. The plaintiff requested fees of $60,000, and the court awarded $35,875, subtracting that portion of the fees attributable to time spent in developing issues and items on which the plaintiff failed to prevail. The plaintiff complains that the award is inadequate.

Defendant SCM, on the other hand, contends that the District Court abused its discretion by setting a fee in excess of the single damages award. Relying on a number of cases, SCM contends that attorneys' fees should not exceed a reasonable percentage of the single damage award. See Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir. 1952); Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561 (7th Cir. 1951).

█ In the cases cited, however, the damage awards were large, and a percentage limitation did not preclude substantial and compensatory attorneys' fees. When the damages recovered are relatively small, as in the present case, it is not necessarily an abuse of discretion to grant fees exceeding the amount of single damages. Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders, 393 F.2d 75 (9th Cir. 1968); Volasco Products v. Lloyd A. Fry Roofing Co., 346 F.2d 661 (6th Cir. 1965).

The plaintiff insists that the District Court underestimated the amount of work attributable to its successful claims, while the defendant asserts that very little legal time or effort was required in respect to the issues on which the plaintiff prevailed. It appears that in fixing the fees, the District Court considered a number of factors: the magnitude and complexity of the litigation, the time and labor spent, the standing of counsel at the bar, and other relevant considerations set out in its supplementary opinion.

█ The District Court is in the best position to evaluate the amount and quality of the work actually performed by plaintiff's attorneys and to determine what proportion of their time and labor was expended on issues with respect to which the plaintiff was ultimately awarded damages. In the circumstances, we cannot conclude that the District Court abused its discretion in awarding fees of $35,875; but as the case must be remanded for modification of the judgment for the plaintiff to include the Commercial Credit item, the District Court will have an opportunity to augment the counsel fees if in its opinion the fees awarded were unduly diminished by reason of the plaintiff's failure to prevail in that court as to the Commercial Credit claim.

Affirmed and remanded for modification of the award of damages.